UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

--------------------------------------------------------

JAMES GRANDBERRY,

        Plaintiff,

     -vs-                Case No. 19-CV-689

SL HARBOUR VILLAGE, LLC,

        Defendant.

--------------------------------------------------------

        Examination of DEBRA BARTH, taken at
the instance of the Plaintiff, under and pursuant
to the Federal Rules of Civil Procedure, before
SAMANTHA J. SHALLUE, a Registered Professional
Reporter and Notary Public in and for the State of
Wisconsin, with all participants appearing via Zoom
videoconference, on December 22, 2020, commencing
at 1:03 p.m. and concluding at 3:28 p.m.

**EXHIBIT**

**1**

1                    A P P E A R A N C E S

2    CADE LAW GROUP, LLC, by
     MR. NATHANIEL CADE, JR.,
3    P.O. Box 170887,
     Milwaukee, Wisconsin 53217,
4    appeared via Zoom on behalf of the Plaintiff.

5    HINSHAW & CULBERTSON, LLP, by
     MR. COREY J. SWINICK,
6    100 East Wisconsin Avenue, Suite 2600,
     Milwaukee, Wisconsin 53202,
7    appeared via Zoom on behalf of the Defendant.

8                        *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:19-cv-00689-LA   Filed 02/01/21   Page 2 of 76   Document 24-1

```
1                    I N D E X

2    Examination:                              Page

3      By Mr. Cade.................................  4

4
     Exhibits Identified:                      Page
5
     Exhibit 11 - Previously Marked Exhibit -
6                 Harbour House Schedule............  86
     Exhibit 13 - Previously Marked Exhibit -
7                 Statement By James Grandberry......  18
     Exhibit 16 - Previously Marked Exhibit -
8                 Missing Resident Checklist.........  51
     Exhibit 19 - Letter Dated 04/04/2018 with
9                 Attached Documentation............  73

10
     Disposition of Original Exhibits:
11
     Attached to Original Transcript.
12

13   Requests:                                 Page

14   Mr. Cade -   Timecards for Ms. Mims, Ms. Bayer,
                  Mr. Grandberry....................  37
15

16                    * * * * *

17

18

19

20

21

22

23

24

25
```

TRANSCRIPT OF PROCEEDINGS

       DEBRA BARTH, called as a witness

herein, having been first duly sworn on oath,

was examined and testified as follows:

             EXAMINATION

BY MR. CADE:

Q   Ms. Barth, good afternoon.  My name is Nate
Cade, and I'm the attorney for James
Grandberry.  We are obviously doing this via
Zoom which makes it a little more difficult.
I'm sure you've had conversations with
Mr. Swinick, but there's only a few rules for a
deposition which are even more important now
that we are doing it via video as opposed to
live.

       So the first thing is that you and I
cannot talk over each other, and by that I mean
Sam, our reporter here, is an excellent
reporter -- I've used her in the past -- but
reporters make mistakes, especially over video,
and if I start asking questions and you jump in
with the answer, what could end up happening is
the transcript gets discombobulated and it has
you asking the question and me giving the
answer.  So it's important that while I am

| | | |
|---|---|---|
| 01:11:58 | 1 | A   I know that she was a memory care resident, and |
| 01:12:02 | 2 | I was familiar with her at the time knowing who |
| 01:12:04 | 3 | she was. |
| 01:12:05 | 4 | Q   Okay.  And if Mr. Grandberry has testified that |
| 01:12:10 | 5 | ▮▮▮▮▮▮▮ used a wheelchair and needed |
| 01:12:13 | 6 | assistance to get on and off the toilet, would |
| 01:12:16 | 7 | you have any reason to dispute that? |
| 01:12:21 | 8 | A   I would not have a reason to dispute that, no. |
| 01:12:23 | 9 | Q   Okay.  And the location of where she was found, |
| 01:12:27 | 10 | do you know which particular bathroom she was |
| 01:12:30 | 11 | located or found in? |
| 01:12:31 | 12 | A   Yes. |
| 01:12:31 | 13 | Q   Which bathroom? |
| 01:12:32 | 14 | A   She was found in the bathroom that was right |
| 01:12:34 | 15 | off of the dining room.  So it would be to |
| 01:12:40 | 16 | the -- if you are facing the kitchenette area, |
| 01:12:45 | 17 | the stove and refrigerator, it is the bathroom |
| 01:12:49 | 18 | to the right of the refrigerator. |
| 01:12:51 | 19 | Q   Okay.  Is that a single-use bathroom? |
| 01:12:54 | 20 | A   Correct. |
| 01:12:54 | 21 | Q   Single person? |
| 01:12:55 | 22 | A   Yes. |
| 01:12:56 | 23 | Q   Okay.  And you said it was a locked door? |
| 01:12:59 | 24 | A   The door could be locked. |
| 01:13:00 | 25 | Q   Right, but at the time it was locked? |

| | | |
|---|---|---|
| 01:14:21 | 1 | locked it, correct? |
| 01:14:22 | 2 | A   Correct. |
| 01:14:22 | 3 | Q   And if it's locked from -- at least on the |
| 01:14:28 | 4 | outside, if someone comes along and twists the |
| 01:14:32 | 5 | handle, I'm assuming, because it's locked, it |
| 01:14:34 | 6 | can't be opened, right? |
| 01:14:36 | 7 | A   Correct. |
| 01:14:36 | 8 | Q   And that's the point of having the lock, |
| 01:14:39 | 9 | someone just can't walk in on you just because |
| 01:14:43 | 10 | they twist the door handle, right? |
| 01:14:45 | 11 | A   I would assume you're right. |
| 01:14:46 | 12 | Q   Okay.  So the only way to open it would be some |
| 01:14:50 | 13 | sort of master key to get it open, fair? |
| 01:14:52 | 14 | A   Yes. |
| 01:14:52 | 15 | Q   Okay.  And do you know how they were able to |
| 01:14:56 | 16 | determine that ████████ was in the bathroom |
| 01:15:00 | 17 | at the time she was located? |
| 01:15:02 | 18 | A   Yes.  A caregiver came downstairs from a unit |
| 01:15:08 | 19 | upstairs, and when she was going through, the |
| 01:15:13 | 20 | co-worker to James said, "I can't find this |
| 01:15:16 | 21 | resident," and they started opening all of the |
| 01:15:20 | 22 | doors and looking and searching for the |
| 01:15:24 | 23 | resident.  They went to the bathroom door, they |
| 01:15:28 | 24 | opened the bathroom door, and the resident was |
| 01:15:32 | 25 | laying on the floor. |

| | | |
|---|---|---|
| 01:16:49 | 1 | talking about just in terms of handling her. |
| 01:16:54 | 2 | Is that a possibility at Harbour Village that |
| 01:16:58 | 3 | if I have an elderly mother or grandmother and |
| 01:17:01 | 4 | I'm concerned about men touching her, that I |
| 01:17:04 | 5 | can say, "I only want female attendants |
| 01:17:07 | 6 | handling my mother or grandmother"? |
| 01:17:09 | 7 | A  There would need to be a reason, and it would |
| 01:17:12 | 8 | need to be care planned. |
| 01:17:12 | 9 | Q  Okay.  If you -- well, let me back up.  The |
| 01:17:25 | 10 | other individual who was on shift with |
| 01:17:31 | 11 | Mr. Grandberry at the time was Jill Bayer, |
| 01:17:35 | 12 | B-A-Y-E-R? |
| 01:17:35 | 13 | A  Yes. |
| 01:17:36 | 14 | Q  And what's the name of the individual who |
| 01:17:39 | 15 | placed ███████████ in the bathroom? |
| 01:17:42 | 16 | A  Kim Mims. |
| 01:17:47 | 17 | Q  Spell that last name. |
| 01:17:49 | 18 | A  M-I-M-S. |
| 01:17:50 | 19 | Q  Was -- was Mr. Grandberry fired the same day |
| 01:17:56 | 20 | the resident went missing and then was found? |
| 01:18:00 | 21 | A  Was he fired? |
| 01:18:02 | 22 | Q  Yes.  Was he terminated, his employment? |
| 01:18:05 | 23 | A  No, not on the same day. |
| 01:18:07 | 24 | Q  What day was he terminated?  The next day? |
| 01:18:10 | 25 | A  On the 6th.  He was suspended -- he was told he |

01:18:13   1        was suspended on the 4th.

01:18:15   2    Q   So the resident went missing on the 4th?

01:18:20   3    A   Correct.

01:18:20   4    Q   And then two days later he was terminated?

01:18:25   5    A   Correct.

01:18:26   6    Q   Ms. Bayer was suspended on the 4th?

01:18:32   7    A   Correct.

01:18:32   8    Q   And was she terminated on the 6th?

01:18:37   9    A   Correct.

01:18:37  10    Q   What about Ms. Mims, was she suspended on the

01:18:42  11        4th?

01:18:42  12    A   She was -- had already left on that day, so she

01:18:49  13        was not suspended on that day.  I did do a -- I

01:18:54  14        did speak with her as part of the

01:18:56  15        investigation.

01:18:57  16    Q   Was she suspended for her involvement in this

01:19:01  17        matter?

01:19:04  18    A   I am not sure if she was suspended.

01:19:09  19    Q   Well, I'm a little perplexed, ma'am, Ms. Barth,

01:19:15  20        because you have familiarity with

01:19:17  21        Mr. Grandberry; you have familiarity with what

01:19:19  22        occurred with regards to Ms. Bayer.  Why is it

01:19:23  23        that you do not have familiarity with what

01:19:25  24        occurred with Ms. Mims?  I mean, you would

01:19:28  25        agree with me she's directly involved, correct?

| | | | |
|---|---|---|---|
| 01:19:31 | 1 | A | Yes. |
| 01:19:31 | 2 | Q | You would agree with me that placing a resident |
| 01:19:36 | 3 | | on the toilet who is wheelchair-bound and |
| 01:19:39 | 4 | | unable to assist or unassist themselves is not |
| 01:19:43 | 5 | | within the policy of Harbour Village, correct? |
| 01:19:48 | 6 | A | It would not be -- yes, it would not be what we |
| 01:19:52 | 7 | | would want to do, to leave a resident |
| 01:19:54 | 8 | | unattended, correct. |
| 01:19:57 | 9 | Q | Okay.  Did ████████████ have the ability to |
| 01:20:00 | 10 | | clean up after herself, wipe herself, or did |
| 01:20:03 | 11 | | she need assistance with that? |
| 01:20:05 | 12 | A | She needed assistance. |
| 01:20:06 | 13 | Q | So I'm troubled -- do you know how long ██████ |
| 01:20:12 | 14 | | ████████████ had been on the toilet? |
| 01:20:16 | 15 | A | It was reported by Ms. Mims that she had put |
| 01:20:19 | 16 | | her on the toilet at approximately 2:50 and -- |
| 01:20:26 | 17 | | or 2:55 and had reported off to the incoming |
| 01:20:32 | 18 | | shift at 3:00 p.m. that she was on the toilet |
| 01:20:35 | 19 | | and they should take her off of the toilet, and |
| 01:20:39 | 20 | | she left her shift at approximately 3:00 p.m. |
| 01:20:41 | 21 | Q | Okay.  Did she say who she spoke with that day |
| 01:20:45 | 22 | | about placing ████████████ on the toilet? |
| 01:20:47 | 23 | A | She said that she told Jill that she had put |
| 01:20:54 | 24 | | the resident on and that James was in the area |
| 01:20:57 | 25 | | and that Jill had nodded which she took to be |

01:21:03   1      an affirmation that Jill was going into the

01:21:07   2      bathroom to attend to the resident.

01:21:09   3   Q  Okay.  So let's break that down.  Ms. Mims

01:21:13   4      states that -- was Ms. Mims -- I asked you

01:21:18   5      about suspension, and I apologize.  Was she

01:21:19   6      terminated for her involvement in this

01:21:22   7      incident?

01:21:22   8   A  She was not.

01:21:24   9   Q  Okay.  So Ms. Mims tells Ms. Bayer, "Hey,

01:21:32  10      ████████ on the toilet," and she gets a nod

01:21:37  11      from Jill which Ms. Mims took as an affirmation

01:21:42  12      that Ms. Bayer understood that ███████ was

01:21:47  13      left alone?

01:21:49  14   A  Correct.  She also stated that James would have

01:21:53  15      heard her because he was in that area with them

01:21:56  16      at the same time.

01:21:58  17   Q  Did you -- did you ever ask James whether he

01:22:02  18      heard Ms. Mims state that ██████████ was on

01:22:06  19      the toilet?

01:22:13  20   A  I would have to look at a statement that I had

01:22:18  21      written based on my investigation with James.

01:22:20  22   Q  Okay.  What statement are you looking at,

01:22:23  23      ma'am?

01:22:23  24   A  I'm not looking at a statement right now.  I

01:22:26  25      know there are statements that are exhibits.

| | | | |
|---|---|---|---|
| 01:22:28 | 1 | Q | Okay.  Well, I'm going to show you Exhibit 13, |
| 01:22:34 | 2 | | if you need to read a statement. |
| 01:22:36 | 3 | A | Okay. |
| 01:22:37 | 4 | Q | Can you see the screen, ma'am? |
| 01:22:49 | 5 | A | I can, yes. |
| 01:22:51 | 6 | Q | Okay.  Now, before we go into this statement, |
| 01:22:57 | 7 | | this is -- you typed this statement up, |
| 01:22:59 | 8 | | correct? |
| 01:22:59 | 9 | A | Correct. |
| 01:23:00 | 10 | Q | This is not a statement that Mr. Grandberry |
| 01:23:04 | 11 | | either handwrote out and you typed or that you |
| 01:23:08 | 12 | | wrote up and that he initialled or indicated |
| 01:23:11 | 13 | | that these are his words, fair? |
| 01:23:14 | 14 | A | Correct. |
| 01:23:14 | 15 | Q | Okay.  Go ahead and take a moment and read |
| 01:23:18 | 16 | | Exhibit 13. |
| 01:23:42 | 17 | A | Okay.  I've read it. |
| 01:23:43 | 18 | Q | Okay.  I've read it as well, and nowhere on |
| 01:23:49 | 19 | | there does it indicate that Mr. Grandberry |
| 01:23:55 | 20 | | acknowledged that he overheard Ms. Mims stating |
| 01:23:59 | 21 | | that ███████ was on the toilet, fair? |
| 01:24:04 | 22 | A | Correct. |
| 01:24:04 | 23 | Q | And let me understand if -- did you take the |
| 01:24:11 | 24 | | statement from Mr. Grandberry on the 4th, the |
| 01:24:16 | 25 | | day he was suspended? |

01:24:17  1    A    Correct.  That evening before he left at --

01:24:21  2         before he was suspended at the end of his

01:24:24  3         shift, I was on campus, and I met with him

01:24:27  4         personally and took his statement.

01:24:28  5    Q    So when you took the statement, when you -- I'm

01:24:31  6         assuming you were sitting at a computer?

01:24:33  7    A    I was not sitting at a computer.

01:24:35  8    Q    Okay.

01:24:35  9    A    I wrote it, and then I -- I wrote it down, and

01:24:38  10        I typed it the next morning as I had written it

01:24:43  11        down.

01:24:43  12   Q    Where are the notes that you used to type this

01:24:47  13        with?

01:24:49  14   A    I don't know.  I don't have them, I don't

01:24:51  15        believe, any longer.

01:24:52  16   Q    So at one point you have handwritten notes, and

01:24:58  17        then after handwriting those notes, you --

01:25:02  18        they're gone; they're disposed of?

01:25:06  19   A    I don't have them in front of me now.  I don't

01:25:08  20        have them.

01:25:09  21   Q    Well, I made a discovery request for all of the

01:25:12  22        documents with regards to the file.  So other

01:25:14  23        than being in Mr. Grandberry's file, if the

01:25:18  24        notes still existed, where would they be in

01:25:20  25        existence at?

| 01:34:02 | 1 | A | I would not. |

01:34:02    1    A    I would not.

01:34:04    2    Q    So if you were doing an investigation, wouldn't

01:34:08    3         you want to know whether in fact Ms. Mims was

01:34:14    4         being truthful with you when she gave you an

01:34:16    5         explanation of what occurred?

01:34:18    6    A    Yes.

01:34:19    7    Q    Okay.  But you never bothered to follow up to

01:34:23    8         verify whether in fact she was truthful; you

01:34:25    9         assumed she was truthful?

01:34:27   10         MR. SWINICK:  Object to form;

01:34:29   11    misstates the witness's testimony.

01:34:31   12         MR. CADE:  You may answer, ma'am.

01:34:34   13         THE WITNESS:  Do you want to ask the

01:34:36   14    question again, please?

01:34:36   15         MR. CADE:  Sure.

01:34:37   16         THE WITNESS:  Thank you.

01:34:37   17    BY MR. CADE:

01:34:37   18    Q    You assumed Ms. Mims was being truthful, fair?

01:34:43   19    A    Yes.

01:34:43   20    Q    Okay.  Now, what time was ███████████ located?

01:34:54   21         What time was she found?

01:34:57   22    A    Approximately 7:50 p.m.

01:35:01   23    Q    Okay.  Other than informing Ms. Bayer

01:35:11   24         purportedly where ███████████ was located, is

01:35:15   25         there any other -- let me rephrase.

Case 2:19-cv-00689-LA  Filed 02/01/21  Page 13 of 76  Document 24-1

01:36:34  1          Mr. Grandberry, she should have specifically

01:36:37  2          told them and they should have waited outside

01:36:39  3          the door for ██████████ to finish, fair?

01:36:41  4     A    Correct.

01:36:41  5     Q    Where did Ms. Mims tell Ms. Bayer -- at what

01:36:48  6          point in the facility, what location, did she

01:36:50  7          say, "I explained to her where ████████ was"?

01:36:57  8     A    I believe she stated that they were outside of

01:37:00  9          the med room door.

01:37:03  10    Q    What's the distance between the med room door

01:37:05  11         and this particular bathroom?

01:37:11  12    A    20 feet.

01:37:12  13    Q    So if Ms. Mims has now violated the policy of

01:37:19  14         the facility and is 20 feet away from the door,

01:37:23  15         was she fired for that?

01:37:26  16    A    No.

01:37:26  17    Q    Did she explain to you the next day why she

01:37:31  18         walked 20 feet away from the bathroom door and

01:37:35  19         left a resident unattended?

01:37:38  20    A    She explained to me that she left the resident

01:37:43  21         and told the oncoming shift that she was on the

01:37:46  22         toilet, that she saw Jill nod her head in

01:37:52  23         affirmation, and then she left her shift, and

01:37:57  24         she believed that Jill was going to take over

01:38:00  25         the care for this resident.

| | |
|---|---|
| 01:38:02 | 1 |
| 01:38:03 | 2 |
| 01:38:20 | 3 |
| 01:38:20 | 4 |
| 01:38:20 | 5 |
| 01:38:23 | 6 |
| 01:38:26 | 7 |
| 01:38:30 | 8 |
| 01:38:33 | 9 |
| 01:38:35 | 10 |
| 01:38:38 | 11 |
| 01:38:41 | 12 |
| 01:38:45 | 13 |
| 01:38:48 | 14 |
| 01:38:51 | 15 |
| 01:38:54 | 16 |
| 01:38:59 | 17 |
| 01:39:02 | 18 |
| 01:39:05 | 19 |
| 01:39:08 | 20 |
| 01:39:12 | 21 |
| 01:39:14 | 22 |
| 01:39:19 | 23 |
| 01:39:23 | 24 |
| 01:39:27 | 25 |

1           MR. CADE:  Sam, would you read back
2      my last question?
3                 (Last question read.)
4  BY MR. CADE:
5  Q    So, Ms. Barth, my question is far different.
6      My question is you've already told me that it's
7      a violation of the policy.  I'm sure the policy
8      doesn't say, "You get to walk 20 feet and
9      orally tell somebody something and that's
10      okay."  You're supposed to wait or someone
11      comes along and you say, "Hey, someone's in the
12      bathroom, replace me."  So explain to me why
13      she walked 20 feet away from the resident and
14      violated the policy and why she wasn't
15      terminated for violating the policy.  And that
16      is compound.
17  A    So I can't tell you why she did it.  She did
18      say that she did, and she was disciplined.
19  Q    What discipline did she receive?
20  A    She received a final warning and reeducation,
21      as well as reeducation for all of our staff.
22  Q    Okay.  And what did that reeducation entail?
23  A    The reeducation was done by the director of
24      wellness and entailed not leaving residents
25      unattended on a toilet.

01:39:29   1    Q    Okay.  Who was the director of wellness?

01:39:32   2    A    Susan Marek.

01:39:36   3    Q    Spell that last name.

01:39:37   4    A    M-A-R-E-K.

01:39:41   5    Q    So Ms. Marek had a meeting or explained -- did

01:39:47   6         she have a meeting, or did she circulate some

01:39:50   7         sort of documentation to the employees about

01:39:53   8         not leaving residents alone on the toilet?

01:40:00   9    A    I'm unsure about how she in-serviced all of the

01:40:06  10         staff.  I was not with her when she in-serviced

01:40:08  11         them.

01:40:08  12    Q    Okay.  Is there a reason why Mr. Grandberry

01:40:13  13         wasn't allowed the privilege of reeducation as

01:40:18  14         opposed to being terminated?

01:40:24  15    A    Mr. Grandberry was terminated for a different

01:40:27  16         reason.

01:40:28  17    Q    What different reason was he terminated for?

01:40:31  18    A    For not knowing where a resident was and not --

01:40:37  19         for almost the entire amount of his shift from

01:40:40  20         3:00 p.m. until ten to 8:00 and not following

01:40:46  21         any type of a missing person protocol to look

01:40:51  22         for a resident or to notify a supervisor.  That

01:40:56  23         was the reason for his termination.

01:40:58  24    Q    As part of the reeducation, were the other

01:41:04  25         employees reminded that not only do you not

01:41:08   1      leave residents alone on the toilet, but you're

01:41:11   2      supposed to follow up if a resident is not

01:41:14   3      around or located?

01:41:18   4   A  I don't have that in-service information in

01:41:21   5      front of me.  I don't know if it was included

01:41:23   6      or not.

01:41:24   7   Q  Okay.  Would you agree with me that if

01:41:35   8      Mr. Grandberry never heard -- let me back up.

01:41:41   9            Are there times -- again, I've got to

01:41:52   10      fix myself.

01:41:53   11            When residents leave the facility

01:42:00   12      from memory care, someone has to sign them out

01:42:03   13      or there's some sort of note in the log they've

01:42:06   14      been signed out, fair?

01:42:08   15   A  Correct.

01:42:08   16   Q  Are you aware of any instance prior to your

01:42:18   17      becoming the director, the executive director,

01:42:21   18      on September 18th of '17 where a resident left

01:42:28   19      the building but there was no indication in a

01:42:31   20      log book for them being signed out, like

01:42:34   21      leaving with a family member or something of

01:42:37   22      that nature or going to the doctor?

01:42:40   23   A  I would have no idea if that happened before my

01:42:42   24      employment.

01:42:43   25   Q  Okay.  Since your employment, has that ever

01:44:24    1          must check the log book at the beginning of a

01:44:27    2          shift?

01:44:32    3     A    I'm not aware that that is a policy that they

01:44:35    4          have to check it at the beginning of a shift.

01:44:38    5     Q    Okay.  Is there a policy that says they're

01:44:42    6          supposed to check it at the middle of a shift

01:44:45    7          for whether a resident has been checked out?

01:44:47    8     A    I'm not aware of a policy that states that.

01:44:50    9     Q    What about at the end of the shift?

01:44:53   10     A    No.

01:44:53   11     Q    Is there any written policy that specifically

01:44:58   12          states a caregiver is supposed to verify or

01:45:03   13          look at the log book as to where a resident is

01:45:07   14          if they're not present on the unit; that's the

01:45:09   15          first place they're supposed to turn?

01:45:11   16     A    Yes, if they're not present.  That was not your

01:45:14   17          question.  If a resident is not present, that

01:45:17   18          is a place that they would look.  They would

01:45:19   19          look at that log book to see if the resident

01:45:23   20          was signed out.

01:45:23   21     Q    And how long do they have to wait before they

01:45:26   22          check the log book if the resident is not

01:45:28   23          present?

01:45:28   24     A    They should be checking that log book within

01:45:33   25          ten minutes at least of beginning to look for a

01:45:36  1    resident who's been identified as not present.

01:45:39  2    They should be looking for the resident and

01:45:42  3    then using the log book, the sign-out book, as

01:45:47  4    "We cannot find this resident, and so now I'm

01:45:50  5    looking at the book to see if the resident has

01:45:52  6    been signed out."

01:45:53  7  Q  Okay.

01:45:53  8  A  So that's -- that happens almost immediately

01:45:58  9    after a -- a look throughout the unit.

01:46:03  10 Q  So it's fair to say that, in this case,

01:46:06  11   Ms. Bayer made a phone call to the resident's

01:46:10  12   family before contacting any senior staff that

01:46:15  13   █████████████ was missing, correct?

01:46:17  14 A  Correct.

01:46:17  15 Q  That's not an appropriate way to handle a

01:46:21  16   missing resident, is it?

01:46:24  17 A  It would be an appropriate way to handle, to

01:46:26  18   call a family member, yes.

01:46:28  19 Q  Okay.  And who was responsible for

01:46:32  20   █████████████?  Was it Ms. Bayer or

01:46:35  21   Mr. Grandberry?

01:46:36  22 A  Both of those people are assigned to -- were

01:46:38  23   assigned to that unit.  They are both

01:46:41  24   responsible for all of the residents under

01:46:42  25   their care.

| | | |
|---|---|---|
| 01:46:43 | 1 | Q Okay. With each shift, do you have multiple |
| 01:47:00 | 2 | men -- let me rephrase. |
| 01:47:04 | 3 | Do you have a male caregiver on every |
| 01:47:07 | 4 | shift? |
| 01:47:09 | 5 | A No. |
| 01:47:09 | 6 | Q Okay. Do the caregivers often divide up who is |
| 01:47:18 | 7 | responsible for certain residents? Well, I |
| 01:47:29 | 8 | should ask -- |
| 01:47:29 | 9 | A It depends on the unit. |
| 01:47:31 | 10 | Q On memory care, how many residents are there on |
| 01:47:34 | 11 | average? |
| 01:47:35 | 12 | A 13 residents in a neighborhood if a unit is |
| 01:47:39 | 13 | full. |
| 01:47:40 | 14 | Q Okay. And at that particular time on October 4 |
| 01:47:45 | 15 | of '17, how many residents were there? |
| 01:47:49 | 16 | A I don't know. I'm not aware. |
| 01:47:52 | 17 | Q Do the caregivers normally split up the |
| 01:47:57 | 18 | residents, "You take this half, and I'll take |
| 01:48:00 | 19 | that half"? |
| 01:48:01 | 20 | A Yes, they would each take residents and would |
| 01:48:07 | 21 | get them -- provide their cares, bring them to |
| 01:48:13 | 22 | meals. |
| 01:48:13 | 23 | Q Okay. So if Mr. Grandberry took responsibility |
| 01:48:17 | 24 | for -- according to him he says, "I have four |
| 01:48:19 | 25 | men, and I take the men and another resident," |

| | | |
|---|---|---|
| 01:52:32 | 1 | in front of me. |
| 01:52:33 | 2 | Q So you knew at one point; you don't know now? |
| 01:52:39 | 3 | A Correct. |
| 01:52:39 | 4 | Q How long ago was she terminated? |
| 01:52:49 | 5 | A I believe she was terminated a few months after |
| 01:52:52 | 6 | this incident occurred, but I don't have the |
| 01:52:56 | 7 | date. |
| 01:52:57 | 8 | Q Was it another incident that caused her |
| 01:53:00 | 9 | termination? |
| 01:53:01 | 10 | A I'm sorry, I don't have the information in |
| 01:53:03 | 11 | front of me. |
| 01:53:05 | 12 | Q Okay.  If a resident is missing, the first |
| 01:53:21 | 13 | thing the staff should do is look, correct? |
| 01:53:24 | 14 | A Correct. |
| 01:53:25 | 15 | Q Did Ms. Bayer ever tell Mr. Grandberry "I'm |
| 01:53:37 | 16 | concerned about ███████ we should start |
| 01:53:40 | 17 | looking"? |
| 01:53:45 | 18 | A We can look at the statement that I have and we |
| 01:53:47 | 19 | can tell that. |
| 01:53:50 | 20 | Q Which statement do you have? |
| 01:53:53 | 21 | A An exhibit, a statement that was submitted to |
| 01:53:57 | 22 | the state.  That would be the statement that |
| 01:54:01 | 23 | would have been taken from Ms. Bayer at the |
| 01:54:05 | 24 | time of the incident. |
| 01:54:08 | 25 | Q Again, this is your drafting of a statement, |

| | | |
|---|---|---|
| 01:58:43 | 1 | Q   Okay.  What is the specific policy in terms of |
| 01:58:56 | 2 | timing for employees -- or, I'm sorry, let me |
| 01:59:00 | 3 | rephrase. |
| 01:59:01 | 4 | What is the specific policy in terms |
| 01:59:03 | 5 | of timing for how often an employee is supposed |
| 01:59:07 | 6 | to lay eyes on a resident? |
| 01:59:12 | 7 | A   There is not a policy that says you need to lay |
| 01:59:15 | 8 | eyes on someone every five minutes or ten |
| 01:59:18 | 9 | minutes.  There is no specific policy about a |
| 01:59:21 | 10 | time. |
| 01:59:21 | 11 | Q   So two hours could be fine and appropriate? |
| 01:59:33 | 12 | A   It could be, depending on the resident and the |
| 01:59:36 | 13 | location of the resident. |
| 01:59:37 | 14 | Q   What do you mean, "the location of the |
| 01:59:39 | 15 | resident"? |
| 01:59:41 | 16 | A   If a resident is in memory care or a resident |
| 01:59:44 | 17 | is in assisted living, so -- and it depends on |
| 01:59:49 | 18 | the needs of the resident.  So there's no |
| 01:59:53 | 19 | policy that says for any particular resident |
| 01:59:56 | 20 | with a particular diagnosis someone has to be |
| 02:00:00 | 21 | observed on a certain interval of time.  There |
| 02:00:05 | 22 | is no policy like that. |
| 02:00:06 | 23 | Q   So it's up to the company or you as the |
| 02:00:13 | 24 | executive director for this specific facility |
| 02:00:17 | 25 | to make a determination, "You should have seen |

02:00:22    1      somebody inside of three hours or one hour," or

02:00:24    2      whatever other time frame, correct?

02:00:25    3   A  Correct.

02:00:26    4   Q  Is there any training that's given, specific

02:00:31    5      documents handed out saying, "These are the

02:00:34    6      time frames by which we have expectations of

02:00:37    7      you as employees"?

02:00:43    8   A  I'm not aware of a document that states that.

02:00:47    9   Q  What about training?  Is there any training

02:00:52   10      where you go over time frames?  You know, "Hey,

02:00:56   11      every half hour in memory care you have to

02:00:59   12      watch out for somebody"?

02:01:02   13   A  We don't have -- we don't have training that is

02:01:06   14      very specific to an amount of time that goes

02:01:10   15      between when you see a resident or how often

02:01:13   16      you have to lay eyes on them.  There's nothing

02:01:15   17      that says every 30 minutes.

02:01:19   18   Q  So if there's not a written policy, there's not

02:01:23   19      even training, how is it that Mr. Grandberry is

02:01:29   20      terminated for not laying eyes on ██████████

02:01:34   21      for approximately four hours and 50 minutes,

02:01:39   22      give or take?

02:01:44   23   A  It occurred because ██████████ didn't come to

02:01:50   24      a meal, because she didn't get her medication,

02:01:54   25      because Mr. Grandberry stated that he wondered

| | |
|---|---|
| 02:02:00 | 1 |
| 02:02:03 | 2 |
| 02:02:10 | 3 |
| 02:02:13 | 4 |
| 02:02:16 | 5 |
| 02:02:19 | 6 |
| 02:02:24 | 7 |
| 02:02:28 | 8 |
| 02:02:29 | 9 |
| 02:02:33 | 10 |
| 02:02:37 | 11 |
| 02:02:40 | 12 |
| 02:02:42 | 13 |
| 02:02:44 | 14 |
| 02:02:45 | 15 |
| 02:02:48 | 16 |
| 02:02:50 | 17 |
| 02:02:56 | 18 |
| 02:02:59 | 19 |
| 02:03:03 | 20 |
| 02:03:07 | 21 |
| 02:03:11 | 22 |
| 02:03:16 | 23 |
| 02:03:19 | 24 |
| 02:03:20 | 25 |

where she was, it was not like her not to be at
a meal.  So in his own words he stated that he
didn't know where she was or why she wouldn't
be there, and yet he took no action to try to
locate her.

Q  Who's responsible for passing out medications?

A  Medication -- the medication aid, and that
would have been Jill.

Q  So when you made the statement that she wasn't
there for her medications, that has nothing to
do with Mr. Grandberry because that would have
been Jill, right?

A  Correct.  It would have been Jill who would
have given her her medications.

Q  Okay.  And did Jill raise her hand when you met
with her and said, "I screwed up and didn't
tell Mr. Grandberry that I couldn't find her or
that she was missing"?

A  No, Jill did not raise her hand and did not say
that she screwed up and didn't tell James, no.

Q  Okay.  And who would be responsible for making
sure that ██████████ was at her meal?  Would
that be Mr. Grandberry, or would that be
Ms. Bayer?

A  It would be both of the people who were on the

| | | |
|---|---|---|
| 02:03:22 | 1 | unit who are working. |
| 02:03:24 | 2 | Q  Okay.  So they both would go to her room and |
| 02:03:28 | 3 |    make sure that she gets down there, or would |
| 02:03:31 | 4 |    one handle it? |
| 02:03:31 | 5 | A  Well, one would go and would get her or one |
| 02:03:37 | 6 |    would make sure, but it isn't an assignment as |
| 02:03:41 | 7 |    to who brings a resident to a meal. |
| 02:03:47 | 8 | Q  Okay.  So did you ask Ms. Bayer whether they |
| 02:03:50 | 9 |    had split responsibilities of who was supposed |
| 02:03:52 | 10 |   to bring ████████ to the meal? |
| 02:03:56 | 11 | A  No.  There is not an official splitting of an |
| 02:03:59 | 12 |    assignment. |
| 02:04:00 | 13 | Q  I understand that there's not an official, |
| 02:04:03 | 14 |    but -- |
| 02:04:03 | 15 | A  And I said no -- I said no, I did not, and I |
| 02:04:06 | 16 |    said there was not a splitting of the |
| 02:04:10 | 17 |    assignment.  I said no. |
| 02:04:11 | 18 | Q  Right, but -- |
| 02:04:13 | 19 | A  Thank you. |
| 02:04:13 | 20 | Q  -- hear me out.  And my question prior to that |
| 02:04:18 | 21 |    was kind of tongue in cheek, but, again, I said |
| 02:04:22 | 22 |    I assume they both don't go up to the room and |
| 02:04:25 | 23 |    get her; one person would be responsible, |
| 02:04:28 | 24 |    right? |
| 02:04:29 | 25 | A  One person would go to get a resident. |

Case 2:19-cv-00689-LA   Filed 02/01/21   Page 25 of 76   Document 24-1

02:08:25   1    Q    I -- go ahead.

02:08:27   2    A    The police -- the -- it was appropriate to call

02:08:30   3         the police, it was appropriate to call 911, and

02:08:34   4         it was appropriate to call the family.  All of

02:08:36   5         those things were appropriate.

02:08:39   6    Q    Before contacting senior staff?

02:08:44   7    A    I don't have a specific timeline that says who

02:08:48   8         was contacted first.  I think many things

02:08:51   9         happened at the same time, and it isn't the

02:08:55  10         timeline about who was contacted that was the

02:08:59  11         issue.  The issue resulting in termination was

02:09:04  12         that the resident's whereabouts were unknown

02:09:08  13         from 3:00 p.m. until ten to 8:00 when another

02:09:12  14         staff person came down and helped to direct the

02:09:16  15         search.

02:09:18  16    Q    Calling the family and calling the police

02:09:21  17         before contacting senior staff is outside of

02:09:26  18         the normal procedures for the facility,

02:09:28  19         correct?

02:09:31  20    A    Calling the family would not be.  If you have a

02:09:35  21         document that you can show me that shows a

02:09:38  22         timeline, I would appreciate it.  Calling the

02:09:41  23         family would be something that we would do if

02:09:44  24         we could not -- if we were locating -- trying

02:09:46  25         to locate a resident.  That isn't something

| | | |
|---|---|---|
| 02:09:49 | 1 | | that we would terminate an employee over, |
| 02:09:51 | 2 | | calling a family member. |
| 02:09:53 | 3 | Q | Okay. |
| 02:09:53 | 4 | A | We're trying to find a resident.  The |
| 02:09:57 | 5 | | resident's whereabouts is most important. |
| 02:09:59 | 6 | Q | I'm going to show you Exhibit 16.  Do you have |
| 02:10:02 | 7 | | that up on the screen, ma'am? |
| 02:10:06 | 8 | A | Yes. |
| 02:10:06 | 9 | Q | And according to Exhibit 16, it is a resident |
| 02:10:11 | 10 | | checklist as of October 15, 2016.  Do you see |
| 02:10:15 | 11 | | that? |
| 02:10:16 | 12 | A | I do, hm-hm. |
| 02:10:17 | 13 | Q | Okay.  Prior to your appearance there, correct? |
| 02:10:24 | 14 | A | Correct. |
| 02:10:24 | 15 | Q | Have you modified this checklist? |
| 02:10:29 | 16 | A | I haven't modified this.  We don't use this. |
| 02:10:33 | 17 | | We're not a part of SLC any longer. |
| 02:10:35 | 18 | Q | Okay.  So three weeks into your employment, you |
| 02:10:39 | 19 | | would agree with me this checklist, Exhibit 16, |
| 02:10:42 | 20 | | is the appropriate checklist, correct? |
| 02:10:45 | 21 | A | Correct. |
| 02:10:45 | 22 | Q | So the first thing they're supposed to do is |
| 02:10:48 | 23 | | inform the front desk or someone they designee |
| 02:10:51 | 24 | | and say "Code Silver," right? |
| 02:10:54 | 25 | A | Correct. |

02:11:52   1    A    Headquarters was not called.

02:11:54   2    Q    No, no, it doesn't say calling headquarters.

02:11:57   3         The front desk is referred to as,

02:12:00   4         quote/unquote, "headquarters."

02:12:02   5    A    Yes, the front desk was not called.

02:12:04   6    Q    Okay.  And then it says you're supposed to

02:12:07   7         notify the executive director or manager.  Was

02:12:10   8         that done?

02:12:11   9    A    It was done, and both Denys who was a

02:12:16   10        supervisor and Sue Marek were notified.

02:12:22   11   Q    Were they notified before the family was called

02:12:23   12        or after?

02:12:24   13   A    You must have an exhibit that states that.

02:12:32   14   Q    I must have an exhibit that states what?

02:12:35   15   A    Do you have an exhibit that states the order?

02:12:40   16   Q    No, ma'am.  I'm asking you.  You told me at the

02:12:43   17        beginning of the deposition you had a

02:12:46   18        familiarity with Mr. Grandberry.  You're the

02:12:49   19        one who did the investigation.  You are the

02:12:50   20        executive director.  So I am asking you based

02:12:52   21        on your prior statement that contacting the

02:12:55   22        family before senior staff was called was

02:12:57   23        appropriate.  I'm going through the checklist

02:13:00   24        right now with you to verify each point.

02:13:04   25             Mr. Grandberry has testified that the

Case 2:19-cv-00689-LA   Filed 02/01/21   Page 28 of 76   Document 24-1

|            |    |                                                         |
|------------|----|---------------------------------------------------------|
| 02:13:06   | 1  | first thing that he knew was the police and the         |
| 02:13:09   | 2  | family showed up.  Ms. Bayer contacted the              |
| 02:13:15   | 3  | family before contacting anyone on senior               |
| 02:13:18   | 4  | staff.  So I'd like to know at what point it            |
| 02:13:21   | 5  | was appropriate for Ms. Bayer to contact the            |
| 02:13:23   | 6  | family and ignore the checklist.  Or would you          |
| 02:13:27   | 7  | agree with me she ignored the checklist, called         |
| 02:13:31   | 8  | the family, and completely violated policy?  We         |
| 02:13:34   | 9  | can cut this short if you'd like to do that.            |
| 02:13:42   | 10 | A   When -- my recollection of the incident is that     |
| 02:13:46   | 11 | when the resident -- it was determined that the         |
| 02:13:49   | 12 | resident was missing and action needed to be            |
| 02:13:52   | 13 | taken, which was approximately 7:45 p.m., that          |
| 02:13:59   | 14 | a number of things happened fairly                      |
| 02:14:02   | 15 | simultaneously, including staff helping to try          |
| 02:14:05   | 16 | to locate the resident, that the supervisor,            |
| 02:14:10   | 17 | Denys, was called, that James was on the phone          |
| 02:14:16   | 18 | with Denys, and at the time that they were on           |
| 02:14:20   | 19 | the phone, that the resident was located and            |
| 02:14:23   | 20 | they were directed to call 911.                         |
| 02:14:27   | 21 | The police were then called, 911, and         |
| 02:14:32   | 22 | the ambulance.  The police and the ambulance            |
| 02:14:35   | 23 | both came to the building, and the family had           |
| 02:14:39   | 24 | been called to see if the resident was with             |
| 02:14:42   | 25 | them.  I'm aware that one daughter was called.          |

| | |
|---|---|
| 02:14:45 | 1 |

She said, "My mother is not with me."  She

called another daughter.  They said the mother

was not with them.  Then the family came to the

building.

           The family arrived, the police

arrived, the paramedics arrived, and I don't

know minute by minute in what order or exactly

a very specific timeline.  I believe all of

those things happened almost simultaneously

when it was decided the situation was serious

and the resident was gone, and that was after

four hours and approximately 45 or 50 minutes

of not knowing or having any -- any -- having

eyes on this particular resident.

Q    Okay.  So, again, I'm going to come back and

     I'm going to go through your checklist and ask

     you the questions.

A    Hm-hm.

Q    If the front desk was not notified, were you

     notified as the executive director prior to

     anything else, prior to the family being

     called, the police showing up, ambulance,

     whatever?  Were you notified?

A    No.  I was notified as all of that was taking

     place.  I was notified in the midst of all of

| | | |
|---|---|---|
| 02:16:05 | 1 | that taking place. |
| 02:16:06 | 2 | Q The police had already shown up by the time you |
| 02:16:09 | 3 | were notified, correct? |
| 02:16:10 | 4 | A The -- I was sitting at my desk and I saw the |
| 02:16:14 | 5 | police and the fire department coming by, and I |
| 02:16:16 | 6 | went down after -- at the same time I received |
| 02:16:20 | 7 | a call from the director of wellness saying |
| 02:16:22 | 8 | that there was a situation with a resident, and |
| 02:16:26 | 9 | I ran down to the building. |
| 02:16:27 | 10 | Q Okay. So, Ms. Barth, I'll ask my question |
| 02:16:30 | 11 | again. The police were contacted before you |
| 02:16:32 | 12 | were, correct? |
| 02:16:33 | 13 | A Correct. |
| 02:16:34 | 14 | Q Okay. Because even if you dial 911 for the |
| 02:16:38 | 15 | police to show up, it still will take a minute, |
| 02:16:42 | 16 | two minutes minimum for them to appear, fair? |
| 02:16:44 | 17 | A Yes, that's correct. |
| 02:16:48 | 18 | Q Okay. And I don't see anywhere on this |
| 02:16:49 | 19 | checklist -- and I can turn to the next page if |
| 02:16:52 | 20 | you'd like -- where it says anything about |
| 02:16:54 | 21 | "simultaneous." "Call the police but |
| 02:16:57 | 22 | simultaneously call the executive director." |
| 02:17:00 | 23 | It doesn't say that anywhere, does it? Do you |
| 02:17:02 | 24 | want me to flip to the next page? |
| 02:17:06 | 25 | A Go ahead. |

Case 2:19-cv-00689-LA   Filed 02/01/21   Page 31 of 76   Document 24-1

| | | |
|---|---|---|
| 02:18:32 | 1 | Q  I mean, in fact, 1, 2, 3, 4 lines before |
| 02:18:37 | 2 | calling the police, you're supposed to notify |
| 02:18:39 | 3 | legal; call the lawyers before you call the |
| 02:18:42 | 4 | police, right? |
| 02:18:44 | 5 | A  Wrong. |
| 02:18:45 | 6 | Q  "Legal counsel notified"?  Do you see that, |
| 02:18:49 | 7 | ma'am? |
| 02:18:51 | 8 | A  If we have a resident that is laying on the |
| 02:18:54 | 9 | floor, we will call 911, and the ambulance will |
| 02:18:59 | 10 | arrive.  That is to meet the needs of the |
| 02:19:04 | 11 | resident.  The police were an escort.  They |
| 02:19:09 | 12 | escorted the ambulance.  The resident was on |
| 02:19:16 | 13 | the floor.  It is policy and it is appropriate |
| 02:19:18 | 14 | that if a resident is laying on the floor that |
| 02:19:20 | 15 | we would -- the staff would call 911 to attend |
| 02:19:23 | 16 | to the resident's medical needs before |
| 02:19:26 | 17 | following a checklist. |
| 02:19:28 | 18 | Q  I understand that, Ms. Barth, and that's -- |
| 02:19:32 | 19 | thank you for that.  My point was on your |
| 02:19:36 | 20 | checklist, when someone is missing, before the |
| 02:19:40 | 21 | police are called, legal is one of the things |
| 02:19:45 | 22 | called.  When ███████ was found, the |
| 02:19:48 | 23 | police had already been notified, correct? |
| 02:19:52 | 24 | A  At the time that 911 was called, they were |
| 02:19:58 | 25 | called because she was on the ground and she |

02:20:00    1    was on the floor and she needed medical

02:20:02    2    attention.  We would never call the legal

02:20:05    3    department before calling 911 to attend to a

02:20:09    4    resident's medical need.

02:20:10    5  Q    Well, and, see, there you jumped the gun

02:20:13    6    because I didn't say "you" meaning the facility

02:20:16    7    called.  Ms. Bayer called the family, and the

02:20:22    8    family called the police, right?

02:20:26    9  A    The -- that is not my understanding of what

02:20:29   10    happened.  The family -- it is not my

02:20:31   11    understanding that the family called the

02:20:33   12    police.  It is my understanding that our staff

02:20:35   13    called 911 and the police escorted the

02:20:39   14    ambulance to the site.

02:20:42   15  Q    So when ███████████ -- when the search began,

02:20:54   16    Denys, whether she was an RN or LPN, was

02:20:57   17    involved in the search, correct?

02:20:59   18  A    No.  She would have been on the telephone.  She

02:21:02   19    was not there in person.

02:21:03   20  Q    Okay.  Why would they have been on the phone

02:21:08   21    with Denys and not with you as executive

02:21:10   22    director when you're the second name or the

02:21:13   23    second thing on the checklist?

02:21:20   24  A    At the time that they were on, they notified --

02:21:26   25    they notified the nurse, and at the same time

02:22:43  1    happened very quickly and simultaneously when

02:22:46  2    they decided to look for the resident.  The

02:22:49  3    resident was found on the ground.  They made

02:22:52  4    the right decision to attend to the medical

02:22:55  5    needs of the resident before doing anything

02:22:57  6    else.

02:22:58  7            They followed -- so they began the

02:23:02  8    search.  They just began the search five hours

02:23:06  9    too late.  The search should have happened on

02:23:11  10   a -- at a number of other points during the

02:23:14  11   shift that they were working when they could

02:23:17  12   not locate and knew that they didn't know where

02:23:19  13   ███████████ was.  When they made the

02:23:24  14   discovery, they did the right thing to call the

02:23:26  15   supervisor and 911 and to have paramedics come

02:23:31  16   to manage her medical needs.

02:23:34  17 Q What manager was on duty at the time that

02:23:37  18   ███████████ went missing?

02:23:39  19 A The manager on duty would always be the nurse

02:23:47  20   who would be the primary nurse for that

02:23:49  21   building.  We don't have a specific designation

02:23:53  22   of someone being a manager on duty on a piece

02:23:57  23   of paper.  The manager of the building is

02:24:00  24   always the person, the nurse -- it's always the

02:24:03  25   person that attends to and answers that first

| | | |
|---|---|---|
| 02:24:05 | 1 | line of medical needs.  I am not a nurse. |
| 02:24:07 | 2 | Q   Other than Ms. Bayer and Mr. Grandberry, who |
| 02:24:12 | 3 | else was physically present from the facility |
| 02:24:15 | 4 | when the search began? |
| 02:24:16 | 5 | A   A caregiver named Elicia who had come from the |
| 02:24:24 | 6 | upstairs -- one of the upstairs units.  She |
| 02:24:27 | 7 | assisted with the search. |
| 02:24:32 | 8 | Q   Spell her name. |
| 02:24:33 | 9 | A   E-L-I-C-I-A. |
| 02:24:38 | 10 | Q   Do you have Elicia's last name? |
| 02:24:40 | 11 | A   A-L-O-N-S-O.  I -- I -- I believe that is how |
| 02:24:54 | 12 | it's spelled. |
| 02:24:55 | 13 | Q   I'm sorry, could you spell that again? |
| 02:24:58 | 14 | A   A-L-O-N-S-O, first name E-L-I-C-I-A. |
| 02:25:02 | 15 | Q   Alonso is the last name? |
| 02:25:06 | 16 | A   Yes, A-L-O-N-S-O. |
| 02:25:09 | 17 | Q   And what document are you looking at for that |
| 02:25:12 | 18 | information? |
| 02:25:12 | 19 | A   I'm looking at your Exhibit 00134 for the |
| 02:25:18 | 20 | spelling of her name. |
| 02:25:19 | 21 | Q   My exhibit?  I don't have an Exhibit -- |
| 02:25:22 | 22 |         MR. SWINICK:  Bates number. |
| 02:25:23 | 23 |         MR. CADE:  Sure. |
| 02:25:29 | 24 | BY MR. CADE: |
| 02:25:30 | 25 | Q   Did you interview Elicia, Ms. Alonso, in terms |

|         |    |   |                                                         |
|---------|----|---|---------------------------------------------------------|
| 02:25:34 | 1  |   | of what she saw or was aware of before you              |
| 02:25:37 | 2  |   | terminated Mr. Grandberry?                              |
| 02:25:39 | 3  | A | Yes, I did.                                             |
| 02:25:40 | 4  | Q | Did you obtain a statement from her?                    |
| 02:25:43 | 5  | A | She typed a statement and gave me a statement.          |
| 02:25:45 | 6  | Q | Okay.  Does it have a Bates number?                     |
| 02:25:52 | 7  | A | I don't know.  Is that -- I don't know.                 |
| 02:25:53 | 8  | Q | It's a number at the bottom.  You'll see it             |
| 02:25:58 | 9  |   | says "SLHV," and then it has numbers.  Is there         |
| 02:26:03 | 10 |   | a SLHV number for her statement?                        |
| 02:26:12 | 11 | A | I don't know.  Do you have it?                          |
| 02:26:14 | 12 | Q | I'm asking you the question, ma'am.  You're             |
| 02:26:18 | 13 |   | reading -- you have a statement in front of             |
| 02:26:21 | 14 |   | you, and I'm asking you about Elicia's                  |
| 02:26:24 | 15 |   | statement.                                              |
| 02:26:24 | 16 | A | Yes.  00135.                                            |
| 02:26:27 | 17 | Q | Other than Ms. Alonso, was there anybody else           |
| 02:26:40 | 18 |   | present who assisted with the search prior to           |
| 02:26:45 | 19 |   | ███████████ being located?                              |
| 02:26:52 | 20 | A | I don't have the names of other people that             |
| 02:26:55 | 21 |   | would have helped.  There would have been two           |
| 02:26:58 | 22 |   | other people on the first floor --                      |
| 02:26:59 | 23 | Q | Okay.                                                   |
| 02:27:01 | 24 | A | -- and they were aware of the resident when it          |
| 02:27:03 | 25 |   | was identified, and they started to look for            |

| | | |
|---|---|---|
| 02:27:06 | 1 | her. |
| 02:27:07 | 2 | Q Who else would be present? You said there was |
| 02:27:15 | 3 | those two other people? |
| 02:27:16 | 4 | A Right. There would have been two staff over on |
| 02:27:19 | 5 | the other side, on the other unit. |
| 02:27:22 | 6 | Q Okay. Was Ms. Alonso terminated for not |
| 02:27:39 | 7 | following the checklist? |
| 02:27:42 | 8 | A No, she wasn't. |
| 02:27:44 | 9 | Q Is Ms. Alonso, was she -- what race is she, if |
| 02:27:52 | 10 | you know? |
| 02:27:52 | 11 | A African American. |
| 02:27:54 | 12 | Q Okay. Now, according to her statement -- I'll |
| 02:28:09 | 13 | pull that up -- she indicates -- let me throw |
| 02:28:16 | 14 | that up -- it's Bates No. SLHV00135 -- "I came |
| 02:28:26 | 15 | downstairs through the front stairs because the |
| 02:28:28 | 16 | elevator was not working properly." She ran |
| 02:28:32 | 17 | into Tynisia, T-Y-N-I-S-I-A, sitting on the |
| 02:28:37 | 18 | couch. At some point, according to her, Jill |
| 02:28:41 | 19 | comes running in and says she essentially can't |
| 02:28:45 | 20 | find ███████, so Ms. Alonso asked Tynisia to go |
| 02:28:53 | 21 | with her to check outside on the patio and the |
| 02:28:57 | 22 | garden. Do you see that? |
| 02:28:59 | 23 | A Yes. |
| 02:28:59 | 24 | Q Is that part of the checklist to go check on |
| 02:29:02 | 25 | the patio, or should they have contacted the |

| | | |
|---|---|---|
| 02:29:05 | 1 | front desk first? |
| 02:29:06 | 2 | A At this point they are looking to see if they |
| 02:29:11 | 3 | can locate the resident. |
| 02:29:12 | 4 | Q That wasn't my question, ma'am.  My question |
| 02:29:15 | 5 | was an either/or.  Should they have gone |
| 02:29:19 | 6 | looking, or should they have contacted the |
| 02:29:22 | 7 | front desk? |
| 02:29:25 | 8 | A They should have looked for the resident to |
| 02:29:29 | 9 | determine if the resident was missing. |
| 02:29:31 | 10 | Q Okay.  She then found another woman, Tasha, |
| 02:29:43 | 11 | T-A-S-H-A, and they look outside on the patio. |
| 02:29:48 | 12 | "We checked all the rooms/bathrooms and didn't |
| 02:29:51 | 13 | find nobody on the cottage side."  Was she |
| 02:29:53 | 14 | missing at that point?  Was ███████████ |
| 02:29:55 | 15 | missing at that point once they've now checked |
| 02:29:58 | 16 | rooms/bathrooms and "didn't find nobody on the |
| 02:30:01 | 17 | cottage side"? |
| 02:30:04 | 18 | A They're looking for her to determine if she's |
| 02:30:07 | 19 | missing. |
| 02:30:07 | 20 | Q Okay.  Well, I'm trying to figure out at what |
| 02:30:11 | 21 | point someone is missing.  If you're going |
| 02:30:14 | 22 | through and looking in various rooms, right -- |
| 02:30:16 | 23 | and ████████████ in a wheelchair, so I would |
| 02:30:19 | 24 | imagine she can't go through the garden very |
| 02:30:22 | 25 | easily on her own, right? |

| | | |
|---|---|---|
| 02:30:28 | 1 | A    Possibly, yes. |
| 02:30:29 | 2 | Q    Right.  I mean, it's not like I'm missing or |
| 02:30:32 | 3 | you're missing.  It's someone in a wheelchair |
| 02:30:34 | 4 | who needs assistance.  So at what point in time |
| 02:30:41 | 5 | is she missing such that they're supposed to |
| 02:30:44 | 6 | contact the front desk? |
| 02:30:48 | 7 | A    If they were following this, she would have |
| 02:30:51 | 8 | been missing about four hours earlier and they |
| 02:30:57 | 9 | would have started this whole process |
| 02:31:00 | 10 | immediately and not four, almost five hours |
| 02:31:05 | 11 | later. |
| 02:31:05 | 12 | Q    Right, but I'm trying to figure out -- see, |
| 02:31:09 | 13 | you're -- I appreciate your statement, and we |
| 02:31:11 | 14 | can go past the three o'clock hour.  I'm trying |
| 02:31:15 | 15 | to figure out once they start looking in rooms |
| 02:31:17 | 16 | and bathrooms and they can't find anybody, is |
| 02:31:21 | 17 | she missing?  That's a yes/no. |
| 02:31:24 | 18 | A    They found her, and so they immediately asked |
| 02:31:31 | 19 | for medical involvement, which was appropriate |
| 02:31:34 | 20 | to do, before anyone was called, before I was |
| 02:31:37 | 21 | called.  They found her, and she was on the |
| 02:31:39 | 22 | ground.  It would have been irresponsible for |
| 02:31:42 | 23 | them to call me to ask about calling the |
| 02:31:45 | 24 | paramedics.  We have a situation where a |
| 02:31:47 | 25 | resident is in medical need, and they called |

Case 2:19-cv-00689-LA   Filed 02/01/21   Page 39 of 76   Document 24-1

| | | |
|---|---|---|
| 02:31:50 | 1 | | 911 which was the proper procedural thing to |
| 02:31:55 | 2 | | do. |
| 02:31:55 | 3 | Q | Ms. Barth, Mr. Swinick is more than able to |
| 02:31:59 | 4 | | make those statements on your behalf.  Again, |
| 02:32:02 | 5 | | I'll come back to and I'll stay on this as long |
| 02:32:04 | 6 | | as I have to.  You would agree with me that the |
| 02:32:07 | 7 | | cottage is not the same place as the memory |
| 02:32:10 | 8 | | care area, right? |
| 02:32:11 | 9 | A | The cottage is the memory care area. |
| 02:32:14 | 10 | Q | Okay. |
| 02:32:15 | 11 | A | It is a neighborhood in memory care.  I do not |
| 02:32:17 | 12 | | agree with you. |
| 02:32:18 | 13 | Q | Okay.  So "I proceeded to go by cottage and |
| 02:32:21 | 14 | | found Tasha, and I looked outside on the patio |
| 02:32:24 | 15 | | in the cottage.  We checked all the |
| 02:32:27 | 16 | | rooms/bathrooms and didn't find nobody on the |
| 02:32:30 | 17 | | cottage side."  Well, ████████ was found in |
| 02:32:34 | 18 | | a bathroom, right? |
| 02:32:35 | 19 | A | That's been established. |
| 02:32:37 | 20 | Q | Okay.  And if they checked all the rooms and |
| 02:32:40 | 21 | | the bathrooms, either Ms. Alonso is lying or |
| 02:32:46 | 22 | | they never checked the one bathroom because the |
| 02:32:48 | 23 | | door was locked, fair? |
| 02:32:51 | 24 | A | That's not fair, no. |
| 02:32:52 | 25 | Q | Okay. |

| | | | |
|---|---|---|---|
| 02:32:53 | 1 | A | That's incorrect. |
| 02:32:55 | 2 | Q | Well, then how can she check all of the rooms |
| 02:33:00 | 3 | | and the bathrooms and "didn't find nobody on |
| 02:33:03 | 4 | | the cottage side"? |
| 02:33:04 | 5 | A | There are two neighborhoods.  There is a |
| 02:33:06 | 6 | | cottage side, and there's a garden side. |
| 02:33:09 | 7 | Q | Okay. |
| 02:33:09 | 8 | A | The resident was found on the garden side, not |
| 02:33:13 | 9 | | on the cottage side.  They share a living room |
| 02:33:15 | 10 | | area. |
| 02:33:16 | 11 | Q | So if they are searching and on the cottage |
| 02:33:22 | 12 | | side she's checked all of the rooms and the |
| 02:33:26 | 13 | | bathrooms, at that point should Ms. Alonso have |
| 02:33:31 | 14 | | said, "Hey, ███████████ missing"? |
| 02:33:38 | 15 | A | I've already given you my statement.  They |
| 02:33:40 | 16 | | found the resident, and they indicated that she |
| 02:33:45 | 17 | | was on the floor, and they called 911.  I have |
| 02:33:47 | 18 | | no other statement to make other than that. |
| 02:33:49 | 19 | Q | Well, I'll ask it again, ma'am, and I |
| 02:33:52 | 20 | | appreciate that. |
| 02:33:52 | 21 | A | Okay. |
| 02:33:52 | 22 | Q | Let's read the next sentence. |
| 02:33:54 | 23 | A | Okay. |
| 02:33:54 | 24 | Q | "Tasha and I came back to the cottage.  The |
| 02:33:58 | 25 | | door to the bathroom off the kitchen was |

02:35:15  1   A   Correct.

02:35:16  2   Q   And I'm asking before they said, "What about

02:35:18  3       that bathroom," and opened the door, when they

02:35:20  4       went through the cottage side and checked

02:35:22  5       everything and didn't find her, was she missing

02:35:25  6       at that point?  That's a yes or no.  Either she

02:35:28  7       was missing or she wasn't missing.

02:35:30  8   A   She was missing.  She -- her location -- they

02:35:39  9       did not know her location.  They did not know

02:35:41 10       her location a long time before that incident

02:35:44 11       occurred and they were looking for her.

02:35:46 12   Q   Okay.  So should Ms. Alonso have been -- should

02:35:53 13       she have contacted the front desk and said

02:35:56 14       "Silver Alert" or whatever the code word is to

02:35:59 15       alert folks that ███████████ was missing?

02:36:03 16   A   It is my opinion that she was doing the right

02:36:06 17       thing by looking for the resident before they

02:36:09 18       alerted someone because they were doing their

02:36:13 19       sweep, their search of the unit, the

02:36:17 20       neighborhoods.  They were doing their sweep,

02:36:19 21       and they were attempting to locate the

02:36:24 22       resident.  They found the resident, and they

02:36:28 23       asked for 911 assistance to take her to be

02:36:33 24       medically examined.

02:36:34 25   Q   I'm looking at Exhibit 16 which is the

Case 2:19-cv-00689-LA  Filed 02/01/21  Page 42 of 76  Document 24-1

| | |
|---|---|
| 02:46:03 | 1 |
| 02:46:20 | 2 |
| 02:46:21 | 3 |
| 02:46:25 | 4 |
| 02:46:27 | 5 |
| 02:46:31 | 6 |
| 02:46:32 | 7 |
| 02:46:39 | 8 |
| 02:46:40 | 9 |
| 02:46:43 | 10 |
| 02:46:50 | 11 |
| 02:46:52 | 12 |
| 02:46:52 | 13 |
| 02:46:58 | 14 |
| 02:47:06 | 15 |
| 02:47:08 | 16 |
| 02:47:12 | 17 |
| 02:47:14 | 18 |
| 02:47:14 | 19 |
| 02:47:19 | 20 |
| 02:47:23 | 21 |
| 02:47:23 | 22 |
| 02:47:25 | 23 |
| 02:47:28 | 24 |
| 02:47:32 | 25 |

Q    I'm going to show you a document, Bates 127
      through 140.

              MR. CADE:  And, Sam, we'll mark this
      as Exhibit 19.

              (Exhibit No. 19 was marked.)

BY MR. CADE:

Q    Ma'am, I'd like to turn to -- we'll go through
      a couple of documents.  First apparently is an
      e-mail dated February 11th, 2018, on Sunday
      that you sent to DHS Caregiver Intake for the
      State of Wisconsin; is that correct?

A    Correct.

Q    And according to this document, there was a
      self-report on October 9 of 2017, correct?

A    Yes, correct.

Q    So let's go over the -- it says there are three
      individual caregivers.  Let's go over that.

A    Okay.

Q    "Misconduct Incident Report."  It indicates
      that "Kim Mims placed," redacted, ████████ "on
      the toilet in the restroom next to the kitchen
      on the garden neighborhood.  At the time of
      shift change" -- well, let me ask you this:
      Did ██████ have her own bathroom?

A    She would have had a bathroom, yes.

| | | | |
|---|---|---|---|
| 02:48:56 | 1 | A | Are you talking about this report that we're |
| 02:48:58 | 2 | | looking at right now? |
| 02:48:59 | 3 | Q | Yes, ma'am. |
| 02:49:00 | 4 | A | I did. |
| 02:49:00 | 5 | Q | Okay.  I don't see in the description of the |
| 02:49:06 | 6 | | incident where you indicate that according to |
| 02:49:08 | 7 | | this the other second shift caregiver would |
| 02:49:11 | 8 | | have overheard the conversation as to the |
| 02:49:14 | 9 | | location of ████████ . |
| 02:49:16 | 10 | A | This is the -- this is the misconduct incident |
| 02:49:22 | 11 | | report that is specific to Ms. Mims.  This is |
| 02:49:26 | 12 | | not an incident report specific to anyone other |
| 02:49:31 | 13 | | than Ms. Mims and what her part is in the |
| 02:49:35 | 14 | | incident. |
| 02:49:35 | 15 | Q | Okay.  Well, let's go to the next page. |
| 02:49:38 | 16 | A | Okay. |
| 02:49:38 | 17 | Q | Up at the top it says it's Page 4 of 9.  What |
| 02:49:57 | 18 | | would be Pages 1, 2, and 3? |
| 02:50:00 | 19 | A | Directions on how to fill out the report. |
| 02:50:02 | 20 | Q | Okay.  And where on here -- so according to |
| 02:50:38 | 21 | | this report, Bates 132, Mims again says she |
| 02:50:46 | 22 | | left her at the end of her shift at 3:00 p.m. |
| 02:50:52 | 23 | | "She stated she informed the oncoming p.m. |
| 02:50:56 | 24 | | caregiver, Jill Bayer, who was in the dining |
| 02:50:57 | 25 | | room that the resident was on the toilet in the |

| | | |
|---|---|---|
| 02:51:00 | 1 | bathroom next to the dining room.  She gave her |
| 02:51:03 | 2 | a nod.  During the investigation, the p.m. |
| 02:51:07 | 3 | caregiver stated that she was not told the |
| 02:51:10 | 4 | resident was on the toilet."  So I come back to |
| 02:51:16 | 5 | my question.  If, in fact, Ms. Mims lied about |
| 02:51:24 | 6 | informing Ms. Bayer as to ████████'s |
| 02:51:27 | 7 | location, should Ms. Mims have been terminated |
| 02:51:31 | 8 | for lying? |
| 02:51:32 | 9 | A   I was not -- if someone lied about a situation, |
| 02:51:38 | 10 | that would be grounds for termination.  It was |
| 02:51:41 | 11 | not determined that she lied. |
| 02:51:43 | 12 | Q   You made a judgment call on who was telling the |
| 02:51:48 | 13 | truth? |
| 02:51:51 | 14 | A   I made a judgment call that it could not be |
| 02:51:54 | 15 | determined if it was a lie or not a lie or if |
| 02:51:59 | 16 | Ms. Bayer had heard or had not heard.  I did |
| 02:52:02 | 17 | make that decision, yes. |
| 02:52:07 | 18 | Q   Okay.  "At approximately 7:55 p.m., the p.m. |
| 02:52:11 | 19 | caregiver called the family and learned the |
| 02:52:13 | 20 | resident was not with them."  That was not part |
| 02:52:19 | 21 | of the checklist, correct? |
| 02:52:28 | 22 | A   That was -- that is a precursor to the |
| 02:52:31 | 23 | checklist to determining if a resident is |
| 02:52:34 | 24 | missing. |
| 02:52:34 | 25 | Q   To call the family? |

| | | |
|---|---|---|
| 02:52:40 | 1 | A    If you're looking for the whereabouts of a |
| 02:52:42 | 2 | resident, you can call the family.  That is |
| 02:52:45 | 3 | permissible to call the family to see if they |
| 02:52:48 | 4 | have the resident or not. |
| 02:52:49 | 5 | Q    Because according to the checklist, while |
| 02:53:00 | 6 | you're searching outside, at some point you're |
| 02:53:03 | 7 | supposed to notify the POA or responsible |
| 02:53:09 | 8 | party, and, I'm sorry, I don't see in the |
| 02:53:10 | 9 | checklist where it says to call the -- |
| 02:53:13 | 10 | actually, it says down at the bottom, |
| 02:53:16 | 11 | "POA/responsible party notified."  Do you see |
| 02:53:19 | 12 | that, three from the bottom on Exhibit 16? |
| 02:53:23 | 13 | A    Yes, I do. |
| 02:53:24 | 14 | Q    Okay.  So they can skip 15 other procedures and |
| 02:53:34 | 15 | call the family first and say, "We're looking |
| 02:53:39 | 16 | for ████████; do you have her?"  That's |
| 02:53:42 | 17 | appropriate? |
| 02:53:46 | 18 | A    At this point they are doing a sweep of the |
| 02:53:49 | 19 | building to determine now that -- if the |
| 02:53:51 | 20 | resident is missing.  If it is determined that |
| 02:53:54 | 21 | the resident is missing and nobody knows where |
| 02:53:57 | 22 | she is, then we follow these steps that are |
| 02:54:01 | 23 | listed on this sheet.  So they are doing the |
| 02:54:06 | 24 | sweep at this point trying to determine her |
| 02:54:09 | 25 | location and if she is a missing person. |

| | | |
|---|---|---|
| 02:54:13 | 1 | Q   That wasn't an answer to my question.  The |
| 02:54:18 | 2 |     checklist is supposed to be followed other than |
| 02:54:21 | 3 |     if someone's on the floor and you have to call |
| 02:54:23 | 4 |     911, medical attention, but if someone is |
| 02:54:27 | 5 |     missing, you start with the very first thing |
| 02:54:30 | 6 |     and work your way down the checklist, right? |
| 02:54:36 | 7 | A   If we're reading the checklist the way you are, |
| 02:54:39 | 8 |     that is correct.  If you're reading the |
| 02:54:41 | 9 |     checklist to make the determination about |
| 02:54:43 | 10 |     whether the person is missing or the person can |
| 02:54:47 | 11 |     be found, you start with a sweep of the |
| 02:54:50 | 12 |     building which is before any of the missing |
| 02:54:52 | 13 |     person checklist is initiated. |
| 02:54:55 | 14 | Q   Okay.  So now you're giving the employees |
| 02:54:59 | 15 |     discretion before they follow the checklist? |
| 02:55:03 | 16 |     Is that what you're saying? |
| 02:55:04 | 17 | A   Absolutely not. |
| 02:55:05 | 18 | Q   So if they do a sweep -- because if they do a |
| 02:55:10 | 19 |     sweep, that's a thorough search of the |
| 02:55:12 | 20 |     building, right? |
| 02:55:12 | 21 | A   That is not what I'm saying, and, no, that is |
| 02:55:15 | 22 |     not correct. |
| 02:55:15 | 23 | Q   A sweep is not a thorough search? |
| 02:55:19 | 24 | A   It says "Once the community has identified a |
| 02:55:21 | 25 |     missing person."  At this point in the process, |

02:55:26  1    they decided to start looking for the resident,

02:55:29  2    and they are looking for the resident.  They

02:55:33  3    found the resident, so officially we've not

02:55:37  4    called a Silver Alert.  The police were called,

02:55:41  5    the fire department was called because we are

02:55:44  6    attending to her medical needs.

02:55:46  7  Q    I get that.  So --

02:55:48  8  A    Okay.

02:55:48  9  Q    -- if, then, just so I can understand this --

02:55:54  10  A    Okay.

02:55:54  11  Q    -- at the time the family is called, it's okay

02:56:05  12    to contact them to verify that she's not with

02:56:09  13    the family, fair?

02:56:12  14  A    That is a correct statement.

02:56:14  15  Q    So if it's okay to verify with the family that

02:56:20  16    she's not there and we're not starting at the

02:56:26  17    beginning of our missing person checklist,

02:56:30  18    then, in fact, she's not a missing person at

02:56:33  19    that point, is she?

02:56:46  20  A    Would you like to rephrase that for me?

02:56:56  21  Q    No, I think I stated it pretty good.  I'll ask

02:56:58  22    Sam to read it back because I think I made my

02:57:01  23    point, but...

02:57:01  24              (Last question read.)

02:57:22  25              THE WITNESS:  Okay.  We have a

Case 2:19-cv-00689-LA  Filed 02/01/21  Page 48 of 76  Document 24-1

02:57:23   1    missing person.  We have a resident that has

02:57:25   2    not been seen since the beginning of a shift.

02:57:32   3    It's determined that at a certain time, 7:50,

02:57:38   4    that nobody knows where she is.  It is

02:57:41   5    appropriate to call the family and to ask, and

02:57:45   6    at the same time, other things were happening.

02:57:48   7    So I'm happy to move on from here.  I'm happy

02:57:53   8    to answer a yes or a no.  I've explained the

02:57:56   9    policy, I've explained the procedure, and I've

02:57:59  10    explained the timeline for this situation.

02:58:03  11   BY MR. CADE:

02:58:04  12   Q    Well, no --

02:58:05  13   A    I'm telling you I can't tell you more than

02:58:08  14    that.

02:58:08  15   Q    We will continue, ma'am.  Thank you.

02:58:11  16   A    Okay.

02:58:11  17   Q    Because if she's missing, the point of the

02:58:14  18    missing person checklist is to follow the

02:58:17  19    checklist as written.  You don't get to pick

02:58:20  20    and choose what part of the checklist you want

02:58:23  21    to follow and don't follow, right?

02:58:28  22   A    You would follow a policy; you would follow a

02:58:30  23    procedure; you would follow a checklist.

02:58:32  24   Q    Okay.

02:58:33  25   A    The --

02:58:33    1    Q    And it doesn't say on this checklist, unless

02:58:37    2         there's -- is there a written policy or is

02:58:38    3         there a training manual somewhere that says,

02:58:40    4         "If someone is missing, call the family first,

02:58:45    5         other than what's identified here third from

02:58:48    6         the bottom, "POA/responsible party notified"?

02:58:53    7         Is there some other list that I'm not aware of

02:58:55    8         that says, "Yeah, she's -- you don't know where

02:58:59    9         she is; go ahead and call the family first

02:59:02    10        before going through your checklist"?

02:59:05    11   A    That is part of the initial protocol if you're

02:59:08    12        looking for a resident.  This missing policy --

02:59:11    13        missing person policy and talking and calling

02:59:15    14        the family is -- in a situation where you've

02:59:20    15        done your sweep of the building, you've done

02:59:22    16        your search, you can't find a resident, you use

02:59:28    17        this missing resident checklist to make all the

02:59:31    18        right calls.

02:59:36    19   Q    But Jill hasn't done a sweep.  She didn't do

02:59:40    20        any of that.  She called the family.  She said,

02:59:43    21        "I haven't seen her."  There's no testimony

02:59:45    22        that Jill did a sweep.  And, again, I don't

02:59:49    23        see, so tell me where I'm missing, where it

02:59:52    24        says, "Employee, you have discretion to call

02:59:56    25        the family first."  If they're not missing,

03:01:11  1    building or not.

03:01:12  2  Q    Where on here does it say "conduct a sweep of

03:01:16  3    the building"?

03:01:17  4  A    It would be prior to determining that the

03:01:19  5    resident was missing.  You don't declare a

03:01:22  6    missing resident before you've done a sweep of

03:01:26  7    the building, all of the rooms to determine if

03:01:29  8    you can find the resident.  Once that's done

03:01:34  9    and it's determined that a resident is missing,

03:01:36  10    you go to the missing resident policy, and this

03:01:39  11    is the policy; this is the checklist that's

03:01:41  12    used.  In doing the sweep of the building, of

03:01:46  13    the units, of the rooms, the resident was

03:01:51  14    located.  So --

03:01:53  15  Q    According -- I'm sorry.  Go ahead.

03:01:55  16  A    That's -- I don't have anything else to say.

03:01:58  17  Q    According to this policy, there also should be

03:02:02  18    a camera review where applicable.  Is there a

03:02:06  19    camera?

03:02:07  20  A    There's a camera -- there is a camera.  The

03:02:10  21    camera is located at the back outside door.

03:02:14  22  Q    Is there a camera inside the facility?

03:02:17  23  A    No.

03:02:17  24  Q    Turning back to Exhibit 19, "The p.m. caregiver

03:02:37  25    wondered where the resident was during the

03:02:41  1    course of the shift but thought the family must

03:02:44  2    have taken her out." Was she missing at that

03:02:46  3    point if she thought she was with the family?

03:02:55  4  A  I can't tell you if -- I can't tell you what

03:02:58  5    she thought or what she didn't think.

03:03:02  6  Q  But that's not my question.

03:03:05  7  A  You asked me if I thought if she thought. I'm

03:03:09  8    telling you I don't know what she thought.

03:03:12  9  Q  I can have Sam read it back.

03:03:12  10  A  Okay.

03:03:14  11  Q  I read the statement, and I said, "Was she

03:03:17  12    missing at that point? So Jill has made a

03:03:22  13    determination. "I haven't seen her all day. I

03:03:27  14    thought she was out with the family." And if

03:03:29  15    she hasn't seen her all day and thought she was

03:03:32  16    with the family, was she missing?

03:03:34  17  A  Jill should have looked for her at that time to

03:03:39  18    determine if she was missing or not missing.

03:03:44  19    At any moment during the course of that shift

03:03:46  20    when either she or Mr. Grandberry didn't know

03:03:51  21    her whereabouts or thought it was unusual for

03:03:53  22    her not to be at a meal, they should have

03:03:57  23    looked for her to determine if she was a

03:03:59  24    missing resident or not.

03:04:04  25  Q  What time is dinner served?

03:04:07  1   A   I would assume -- now it's served at

03:04:09  2       approximately 4:30.  I would assume it was

03:04:13  3       served at about 4:30.  I don't think it's

03:04:16  4       changed much in the years.

03:04:17  5   Q   Why was Ms. Mims given a final written

03:04:35  6       counseling on October 11th, a week after the

03:04:38  7       incident?

03:04:39  8   A   She didn't work before that.  That's when --

03:04:42  9   Q   She went a full week without work?

03:04:44  10  A   That's when we saw her next, I believe.

03:04:46  11  Q   According to Ms. Alonso, Mr. Grandberry

03:05:19  12      contacted Sue.  That would be Sue Marek,

03:05:21  13      correct?

03:05:23  14  A   Correct.

03:05:24  15  Q   Is that appropriate if someone is missing to

03:05:27  16      contact Sue Marek, a supervisor?

03:05:31  17  A   She was the director of wellness.  It would be

03:05:34  18      appropriate for them to call.  If they are in

03:05:39  19      the midst of trying to locate a resident, it

03:05:43  20      would be appropriate for them to call, yes.

03:05:45  21  Q   Would that be appropriate during the sweep

03:05:48  22      while you're trying to determine if they're

03:05:49  23      missing or once you've made a determination

03:05:52  24      they're missing?

03:05:53  25  A   It would be appropriate at either of those

|       |    |   |                                                        |
|-------|----|---|--------------------------------------------------------|
| 03:05:56 | 1  |   | times.                                              |
| 03:05:57 | 2  | Q | Sue Marek made a statement as well, correct?        |
| 03:06:12 | 3  | A | Correct.                                            |
| 03:06:12 | 4  | Q | Who is Janelle, according to Jill Bayer's           |
| 03:06:38 | 5  |   | statement?  It says "I asked Janelle for an         |
| 03:06:46 | 6  |   | update," J-A-N-E-L-L-E.  Ms. Barth, who is          |
| 03:07:03 | 7  |   | Janelle?                                            |
| 03:07:03 | 8  | A | I -- I believe she is a caregiver.  I know she      |
| 03:07:08 | 9  |   | was a caregiver.  I don't know what shift she       |
| 03:07:13 | 10 |   | was working on that day.                            |
| 03:07:16 | 11 | Q | Okay.  So if it says "I asked Janelle for an        |
| 03:07:22 | 12 |   | update," did Janelle get terminated?                |
| 03:07:33 | 13 | A | No, Janelle did not get terminated.                 |
| 03:07:36 | 14 | Q | Did you get a statement from Janelle?               |
| 03:07:43 | 15 | A | I don't have a statement from Janelle.  Janelle     |
| 03:07:46 | 16 |   | was not involved in this incident.                  |
| 03:07:49 | 17 | Q | Well, but if Jill called Janelle and said,          |
| 03:07:54 | 18 |   | "Where is ████████" doesn't that mean that          |
| 03:07:56 | 19 |   | she's involved?                                     |
| 03:08:05 | 20 | A | I don't know what assignment Janelle had or         |
| 03:08:07 | 21 |   | what unit she worked on or where she was.  She      |
| 03:08:10 | 22 |   | was not working on the night of the incident.       |
| 03:08:18 | 23 |   | I don't have a report in front of me that says      |
| 03:08:20 | 24 |   | when she was working.                               |
| 03:08:21 | 25 | Q | Well, I do, Exhibit 11.  Janelle Tatum, October     |

| 03:08:26 | 1 | | 4th.  Let's see if I can read exactly what that |
|---|---|---|---|

03:08:26  1       4th.  Let's see if I can read exactly what that

03:08:36  2       says.  What does "M" stand for?

03:08:43  3   A   I believe med passer.

03:08:44  4   Q   Okay.  And then there's some handwriting or

03:08:48  5       something next to that.  Do you know what that

03:08:50  6       means?

03:08:50  7   A   I don't know.

03:08:52  8   Q   As the med passer, that would be the same thing

03:09:04  9       as Mr. Grandberry -- I'm sorry, as Ms. Bayer.

03:09:11 10       You're supposed to -- I mean, the med passer is

03:09:13 11       looking at every single one of the residents,

03:09:16 12       correct?

03:09:18 13   A   The med passer is responsible like everybody

03:09:22 14       else, but that med passer is responsible for

03:09:25 15       passing meds to whomever has medications.

03:09:29 16   Q   Okay.  I am looking on this exhibit, ma'am.

03:09:33 17       What does the "X" mean?

03:09:40 18   A   Tell me where.

03:09:41 19   Q   Well, Mr. Grandberry has an "X," and it says

03:09:47 20       the 5th he's off, but the day that he's working

03:09:50 21       3:00 to 11:00, it says "X."

03:09:57 22   A   I can't tell you.  I don't know what the "X" --

03:09:59 23       if I look at this, it would appear that he was

03:10:03 24       not the med passer, and "M" would be the person

03:10:06 25       who's passing meds.  The "X" would be the

| | | |
|---|---|---|
| 03:10:10 | 1 | person who is working but not passing meds. |
| 03:10:14 | 2 | Q  So the "X" would not necessarily go to every |
| 03:10:18 | 3 | resident to hand medication, correct? |
| 03:10:22 | 4 | A  The "X" would not hand medication to anybody. |
| 03:10:26 | 5 | Q  Did ▮▮▮▮▮▮▮ need medication? |
| 03:10:34 | 6 | A  I believe she was on medication, but I don't |
| 03:10:36 | 7 | have a medication list for her in front of me. |
| 03:10:40 | 8 | I don't know.  I don't recall what medications |
| 03:10:44 | 9 | she might have been getting. |
| 03:10:46 | 10 | Q  According to Ms. Bayer, she said "BF is still |
| 03:11:08 | 11 | on half-hour checks."  Who is "BF"? |
| 03:11:11 | 12 | A  A resident. |
| 03:11:13 | 13 | Q  A specific resident? |
| 03:11:16 | 14 | A  Yes.  Those would be the initials of a |
| 03:11:22 | 15 | resident. |
| 03:11:22 | 16 | Q  Okay.  So "I asked Janelle for an update," and |
| 03:11:26 | 17 | is it Janelle told her that BF is on the |
| 03:11:29 | 18 | half-hour checks, or is it Jill telling Janelle |
| 03:11:32 | 19 | the half-hour checks? |
| 03:11:34 | 20 | A  I -- I can read it the same as you can.  "I |
| 03:11:39 | 21 | asked Janelle for an update.  She said BF is |
| 03:11:43 | 22 | still on half-hour checks." |
| 03:11:43 | 23 | Q  Right, except these are your notes.  So it's |
| 03:11:46 | 24 | not Jill's exact statement; it's your notes, |
| 03:11:49 | 25 | and your notes -- |

Case 2:19-cv-00689-LA   Filed 02/01/21   Page 56 of 76   Document 24-1

| | | |
|---|---|---|
| 03:26:22 | 1 | A  You have my notes, and this is what I |
| 03:26:24 | 2 | documented.  So, yes, that would be correct. |
| 03:26:29 | 3 | I -- this is exactly what I did. |
| 03:26:33 | 4 | Q  Were you present as an employee as the |
| 03:27:01 | 5 | executive director when Mr. Grandberry was |
| 03:27:03 | 6 | having issues with his pay stubs and he was not |
| 03:27:10 | 7 | being compensated for work? |
| 03:27:12 | 8 | A  No, I believe that was before my time, before I |
| 03:27:15 | 9 | was there as the director. |
| 03:27:17 | 10 | Q  Fair enough.  Give me one second, ma'am. |
| 03:28:01 | 11 | MR. CADE:  Those are my questions. |
| 03:28:08 | 12 | MR. SWINICK:  Nothing from me. |
| 03:28:12 | 13 | MR. CADE:  Thank you, Ms. Barth. |
| | 14 | (Proceedings concluded at 3:28 p.m.) |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

Case 2:19-cv-00689-LA  Filed 02/01/21  Page 57 of 76  Document 24-1

```
1    STATE OF WISCONSIN  )
                         ) SS:
2    COUNTY OF MILWAUKEE )

3

4

5             I, SAMANTHA J. SHALLUE, a Registered

6    Professional Reporter and Notary Public in and for

7    the State of Wisconsin, do hereby certify that the

8    above Zoom deposition of DEBRA BARTH was recorded by

9    me on December 22, 2020, and reduced to writing

10   under my personal direction.

11            I further certify that I am not a

12   relative or employee or attorney or counsel of any

13   of the parties, or a relative or employee of such

14   attorney or counsel, or financially interested

15   directly or indirectly in this action.

16            In witness whereof I have hereunder set

17   my hand and affixed my seal of office at Milwaukee,

18   Wisconsin, this 4th day of January, 2021.

19

20

21

22                      _____
                                   Notary Public
23                      In and for the State of Wisconsin

24
     My Commission Expires:  June 3, 2023.
25
```

BROWN & JONES REPORTING, INC
414-224-9533

Exhibit 3

# Harbour House

## GARDEN

AM 40/40
16/16
PM 24/24
16/16
noc 40/40

OCTOBER OF 2017

| Staff | Sun 10/1 | Mon 10/2 | Tues 10/3 | Wed 10/4 | Thurs 10/5 | Fri 10/6 | Sat 10/7 | Sun 10/8 | Mon 10/9 | Tues 10/10 | Wed 10/11 | Thurs 10/12 | Fri 10/13 | Sat 10/14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **7:00 a.m. - 3:00 p.m.** ||||||||||||||
| A Weshuna Love | OFF | X | X | | X | OFF | M | M+2nd-C | X | 2nd | X | X | X | OFF |
| B Janell Tatum | M | M | OFF | M+EOR | M E | M | M | 2nd | M-M | M | M | M | OFF | M+2nd |
| A Kim Mims | X | OFF | | OFF | OFF | X+2nd | OFF | OFF | OFF | X | OFF | OFF | X | X |
| B NEED EOW 16/16 | OFF | OFF | OFF | OFF | OFF | OFF | OFF | Tasha-2nd | OFF | OFF | OFF | OFF | OFF | OFF |
| | | | Desirae | | Brandon X | | Angela K. | | Tynsia | | Tasha+Chinna | Chinna | TiShiana | |
| **3:00 p.m. - 11:00 p.m.** ||||||||||||||
| B James Grandberry | | X | X | X | OFF | s/s | OFF | OFF | X | X | X | OFF | | X |
| A Jill Bayer | M-9 | M | M | M | M | OFF | M | M | M | OFF | M | M | M | OFF |
| A 24/24 NEED PT | OFF | OFF | OFF | OFF | Tasha | Tasha | Janell 1-9 | OFF | Shuna-9 | OFF | Tasha | OFF | Janell-9 |
| B NEED EOW 16/16 | OFF | OFF | OFF | OFF | OFF | OFF | NEED | OFF | OFF | OFF | OFF | OFF | OFF | OFF |
| | | | | | | Kim | Jicina | | | | | | | |
| **11:00 p.m. - 8:00 a.m.** ||||||||||||||
| A Kim Young | X | OFF | OFF | OFF | OFF | X | OFF | OFF | X | X | OFF | OFF | OFF | X |
| B 40/40 NEED FT 2nd | OFF | Jessica -6:30 | NEED | Jessica -6:30 | OFF | OFF | Bessie | Jessica -6:30 | OFF | OFF | NEED | Bessie | Bessie | OFF |
| | | | Jessica (6:30) | | Bessie | | | | | | | | | |

| | | | |
|---|---|---|---|
| | Sr. Resident Assistant | A | Americana |
| | Need/Open Shift | W | Woodlands |
| M | Medication Passer for Floor | C | Cottage |
| M | Medication Passer in Household | G | Garden |
| X | Help Set Up Large Activity and do Small Activity | CI | Call In |
| | Large Group Activity | | |
| M-T | Med Train | | |

| | | |
|---|---|---|
| F | Float between floors | |
| T | Shadow Training | |
| V | Vacation | |
| S/S | Switched Shift | |

Dietary and AL CBRF Training    9:00-5:00p
Skill and Core Training    1:00p

EXHIBIT
Grandberry
11
SK
PENGAD 800-631-6989

Statement by James Grandberry
Taken by Debra Barth, Executive Director
Re: Incident with REDACTED on 10/4/17

I am responsible for most of the men. We have 4 men. I take the men and resident R\*\*. Jill helped me with residents R\*\* and C\*\*. At 2:45 PM I started talking with Sue (Director of Wellness), talking about the job and people working. At 3 PM I came to the Unit. Girls were in the office (med room). I talked to them and they were getting ready to leave. Jill was doing (med) count and I went into activities. Played games, talking, singing, being happy. Then it was time for dinner. I pushed people in, set up tables. I was like, where's REDA . Jill said, 'She must be out.' She said, "I don't know why she's out and they (day shift) didn't give her meds." Usually family doesn't take her out, they usually visit. I didn't think anything about it. I got through cleaning the kitchen, took people to activities, took Millie to the other building, took garbage out. Jail says it seems kind of strange that REDAC out and no one's called. I had no idea that she was in the bathroom. I find it strange that she was in there. I didn't look at the 24 hour report, usually the med passer does. I'm in activity. Jill first started asking about Loretta around 4:45 -5 PM. We didn't make calls to supervisors. I thought it was strange that REDAC wasn't here. She never misses a meal, even when she's sick she still eats slowly. When her daughter's come and take her to a doctor visit she's usually back.

Jill said, "I hope they're fixing a plate." She said, "They could have told us." I said, "It's strange she's not here." I started opening doors. Instead of looking, Jill called the family. There was lots of commotion. I asked when the last time she was toileted.

(After the EMTs arrive) Jill was talking to the police. She said so and so left her on the toilet. Sue (Director of Wellness) was on my phone. I gave the phone to Jill. (Someone) said to Jill, "You're talking too much. What you should have done first is look before you call the family." We should have laid eyes on everyone.


10/4/17

EXHIBIT
Grandberry
13
SK
PENGAD 800-631-6989



## Senior Lifestyle Corporation
### 1.7.8.1 Missing Resident Checklist rev. 10/15/16
(To be attached to an SLC Incident Report)

Community: _____    Resident's Name: _____

Apt #: _____    Date: _____    ☐ Resident suspected as missing    ☐ Door alarm sounding/Resident missing

| Item | Date/Completed By | Comments |
|---|---|---|
| Once the community has identified a missing resident, inform the front desk and/or designee by stating "Code Silver" and the room number of the missing person. | | |
| Front desk and/or designee will be in charge of the initial search and will be referred to as Headquarters. The front desk or designee will notify the Executive Director and a manager on if the Executive Director is not present at the time of the event. | | |
| If alarm is activated- Alarm silenced after Executive Director/ manager on-duty and Security notified | | |
| The Executive Director or Manager on Duty will assign 2 team members to search the community perimeter and one team member to search the missing residents room. | | |
| Resident head count and systematic room search to be initiated. | | |
| The front desk will review Sign-out Log & the Health and Wellness Director, Memory Care Director or designee will review the 24 Hr. Report to determine if the resident is out of the building. | | |
| The Program Director, Memory Care Director or designee should also review other program outing sign-out sheets that may show an outing event is taking place. | | |
| Thorough search inside of community | | |
| Thorough search outside of community | | |
| Notify Local Management Personnel  (On-duty personnel to notify Managers) | | |
| HWD, MCD or DON notified | | |
| ED/Administrator notified | | |
| Where applicable camera review | | |
| Notify Regional/Divisional/HO Personnel  (*Notification to be done by ED/ALD or Administrator/DON) | | |
| RDO/VP of OPs notified* | | |
| RDHW/ Clinical OPs notified* | | |
| Call Significant Event line (this is to report and is not a form of immediate contact. | | |
| Risk Management notified** | | |
| Legal Counsel notified** | | |
| COO/CEO notified** | | |
| POA/Responsible party notified* | | |
| Attending physician notified* | | |
| Local authorities/police notified* | | |

EXHIBIT
Grandberry
16

8K

PENGAD 800-631-6989

CONFIDENTIAL
SLHV_00167

| | | |
|---|---|---|
| Consider activating "Silver Alert"* | | |
| Organize search teams | | |
| Provide all search teams with information for resident identification | | |
| Check with family, friends and local establishments/places resident goes | | |
| Check local transport companies | | |
| Re-check inside and outside community | | |
| Expand search to neighborhood within a two mile radius | | |
| Expand search further, as directed | | |
| Upon return to facility, exam resident and provide treatment as necessary | | |
| HWD//DON notify attending physician of return, obtain and follow orders | | |
| Notify POA/Resp. party of return* | | |
| Notify search teams of return | | |
| Implement intervention to prevent any further occurrence in service plan. | | |
| Institute a 24-hour monitoring schedule of the resident. | | |
| Notify State Regulatory Agency as per State regulatory guidelines | | |
| RDHW to review before submitting | | |
| Complete documentation | | |
| SLC Incident Report/Send to H.O. | | |
| Documentation in resident chart | | |

*Personnel are not authorized to speak to the media without the express consent of the VP/RDO. Updated 10/15/2016

CONFIDENTIAL   SLHV_00168

DIVISION OF QUALITY ASSURANCE

1 WEST WILSON STREET
PO BOX 2969
MADISON WI 53701-2969

Telephone: 608-266-8481
Fax: 608-267-0352
TTY: 711 or 800-947-3529



Scott Walker
Governor

Linda Seemeyer
Secretary



**State of Wisconsin**
Department of Health Services

April 04, 2018

**CONFIDENTIAL**

James Grandberry
4606 N. 41st St.
Milwaukee, WI 53209

Dear Mr. Grandberry:

The Division of Quality Assurance, Office of Caregiver Quality (OCQ), is responsible for receiving, investigating and acting upon complaints of alleged misconduct by noncredentialed caregivers. Caregiver misconduct includes abuse or neglect of a client, or misappropriation of a client's property.

Our office received a report on February 12, 2018, alleging that caregiver misconduct occurred at The Harbour House, on or about October 04, 2017. Based on a review of the information currently available, OCQ will not conduct an investigation of the alleged incident at this time. However, if additional information becomes available, this case could be opened at a later date. Information about this report is considered confidential and will not be released to the public.

This determination does not affect, negate, or resolve other violations or regulatory enforcement actions that may have been issued or taken by the Department, nor does it affect, negate, or resolve employment issues relating to possible work rule violations.

If you have questions regarding this notice, please call 608-261-8319 or write to the address above.

Sincerely,

*Laurie Arkens*

Laurie Arkens, Director
Office of Caregiver Quality

LA: as

cc:     The Harbour House
        File 65310

Grandberry
EXHIBIT 19

**Debra Barth**

| | |
|---|---|
| **From:** | Debra Barth |
| **Sent:** | Sunday, February 11, 2018 1:19 PM |
| **To:** | dhscaregiverintake@dhs.wisconsin.gov |
| **Cc:** | Debra Barth |
| **Subject:** | Harbour House F62447 - 3 reports for 1 incident |
| **Attachments:** | K.Mims F62447.pdf; J.Grandberry F62447.pdf; J. Bayer F62447.pdf |

Please find attached 3 Misconduct Incident Reports for 3 individual caregivers of Harbour House, 5900 Mockingbird Lane, Greendale, WI 53129.
There was an incident on 10/4/17 related to a resident.
A self-report was sent to the Bureau of Assisted Living, Southeastern Regional Office on 10/9/17.
Misconduct Incident Reports were not submitted as the investigation found there was no criminal intent and no intentional actions on the part of the caregivers involved.

On 1/31-2/1/18, there was a State Survey at Harbour House related to this self-report.
The surveyors felt that Misconduct Incident Reports should have been filed.
I am submitting the 3 reports along with investigation documentation now.

Please contact me if more information is required.

Debra Barth, Executive Director
414-750-5922
Harbour House
5900 Mockingbird Lane
Greendale, WI 53129


**Debra Barth**
Executive Director

Harbour Village
5700 Mockingbird LN
Greendale, WI 53129

414-433-9302
seniorlifestyle.com

   

Embrace **life.**
Embrace **moments.**
Embrace **connection.**

The email you received from Senior Lifestyle Corporation and any file attachments(s) are confidential, may be legally privileged, and are intended solely for use by the identified recipient(s). If you received the email in error, please notify the sender and delete the message and any copies completely from your computer. Dissemination, distribution, or copying of

# MISCONDUCT INCIDENT REPORT

Completion of this form is required by Wis. Admin. Code § DHS 13.05(3)(a). Failure to file a complete and accurate report of an incident of alleged misconduct, as required, may subject the entity to forfeiture or other sanctions specified by the Department under § DHS 13.05(3)(e) and may delay the investigation process. Personal information will be used to investigate the reported incident and the results of the investigation may be shared with other authorized investigative agencies.

**This report form must be completed in its entirety. Additional information may be attached.**

### TYPE OR PRINT NEATLY IN BLACK INK.

## I. ENTITY INFORMATION

| Name – Entity or Facility | | | | | |
|---|---|---|---|---|---|
| Harbour House | | | | | |
| Federal Provider or Certification No. | State License, Approval, or Registration No. | | Entity Type Code *(See instructions.)* 83 | | |
| Street Address 5900 Mockingbird Lane | City Greendale | County Milwaukee | | State WI | Zip Code 53129 |
| Name – Administrator Debra Barth | | | Telephone No. 414-421-9600 | | |

## II. SUMMARY OF INCIDENT

**INDICATE** when the incident occurred. If the exact date and time are unknown, make a reasonable estimate and indicate that the date and time are estimated. Include the date the incident was discovered, if other than the date the incident occurred.

| Date Occurred *(MM/dd/yyyy)* | Time Occurred | Date Discovered *(MM/dd/yyyy)* |
|---|---|---|
| 10/04/2017 | 2:50 PM | 10/04/2017 |

**BRIEFLY DESCRIBE THE INCIDENT** in the space below. Summarize the incident here even if additional documentation is attached.

At approximately 2:50 PM on 10/4/17, caregiver Kim Mims placed resident REDACTED on the toilet in the restroom next to the kitchen on the Garden neighborhood. At the time of shift change, Ms. Mims stated she informed the 2nd shift caregiver that Ms. REDAC was on the toilet and the caregiver nodded in what she took to be an acknowledgement. Ms. Mimms left her shift and did not personally take Mrs. REDAC off of the toilet. Mrs. REDAC was found laying on the floor of the bathroom next to the toilet at approximately at 7:55 PM.

**DESCRIBE THE EFFECT** that the incident had on the affected person, the person's reaction to the incident, and the reaction of others who witnessed the incident.

Mrs. REDA was transported to the hospital. There was no physical injury and she was returned to Harbour House by EMT at 1:15 AM on 10/5/17. Mrs. REDAC did not exhibit any signs of distress upon her return.

**EXPLAIN** what steps the entity took upon learning of the incident to protect the affected person(s) and others from further potential misconduct.

Harbour House took the following actions in response to this incident:
- Harbour Houses employees were re-educated on the Missing Person Response Procedure,
- the two PM employees were terminated from employment for not following the Missing Person Response Procedure,
- Ms. Mims, who left the resident on the toilet at the end of the shift, has been re-educated to finish providing care prior to leaving the shift and recieved a final written counseling,
- HarbourHouse employees were re-educated to complete providing care fot residents prior to leaving at the end of a shift.

CHECK the specific location where the incident happened.

☒ At Your Entity   ☐ During Transport   ☐ Another Location — *Explain.*

---

## III. AFFECTED PERSON INFORMATION  *(If more than one, include additional pages.)*

| Name – Affected Person | Date of Birth *(MM/dd/yyyy)* | Sex | Telephone No. |
|---|---|---|---|
| REDACTED | REDACTED | ☐ M  ☒ F | NA |

| Address | City | State | Zip Code |
|---|---|---|---|
| 5900 Mockingbird Lane | Greendale | WI | 53220 |

If the affected person is adjudicated incompetent, under age 18, or has an authorized Power of Attorney for Health Care, include the name, address, and telephone number of parent, guardian, or legal representative.

| Name - Parent, Guardian, or Power of Attorney | Telephone No. |
|---|---|
|  | REDACTED |

| Address | City | State | Zip Code |
|---|---|---|---|
| REDACTED | REDACTED | RE | REDAC |

---

## IV. ACCUSED PERSON INFORMATION  *(If more than one, include additional pages.)*

| Name – Accused Person (if known) | Date of Birth *(MM/dd/yyyy)* | Sex | Home Telephone No. |
|---|---|---|---|
| Kim Mims | REDACTED | ☐ M  ☒ F | 414-484-3325 |

| Position, Title, or Relationship to Affected Person *(at the time of the incident)* | Social Security No. |
|---|---|
| caregiver | REDACTED |

☒ Non Credentialed Staff   ☐ Credentialed Staff   ☐ Resident   ☐ Other *(Specify.)*

List any known credential held by accused at time of incident; e.g., RN, LPN, social worker, security guard, professional counselor.
none

| Home Street Address | City | State | Zip Code |
|---|---|---|---|
| 331 W. Hadley | Milwaukee | WI | 53212 |

*NOTE:  If employer is other than the reporting entity, provide information about accused person's current employer.*

| Name – Employer | Sex | Telephone No. |
|---|---|---|
|  | ☐ Male  ☐ Female |  |

| Street Address | City | State | Zip Code |
|---|---|---|---|
|  |  |  |  |

*NOTE:  If accused person is under 18, provide parent(s) or guardian information.*

| Name(s) – Parent or Guardian | Sex | Telephone No. |
|---|---|---|
|  | ☐ Male  ☐ Female |  |

| Street Address | City | State | Zip Code |
|---|---|---|---|
|  |  |  |  |

## V. LAW ENFORCEMENT INVOLVEMENT

Was law enforcement contacted or involved?

☐ No    ☒ Yes    If "yes," complete the following. Attach copy of the law enforcement incident report, if available.

| Name – Officer (if available) | | Telephone No. | |
|---|---|---|---|
| Officer Dibbs | | 414-423-2121 | |
| Name – Department | | Case No. (if available) | |
| Greendale Police Department | | | |
| Street Address | City | State | Zip Code |
| 5911 W. Grange Ave. | Greendale | WI | 53129 |

## VI. PERSONS WITH SPECIFIC KNOWLEDGE OF THE INCIDENT    *If more space is necessary, attach additional pages.*

| Name – Person who REPORTED Incident to the Entity | Sex | Telephone No. | |
|---|---|---|---|
| Erica Alonso | ☐ Male ☒ Female | | |
| Street Address | City | State | Zip Code |
| | | | |

Is this person an ENTITY EMPLOYEE?    ☐ Yes    ☒ No

Position in the Entity or Relationship to the Affected Person:    Caregiver

| Name – Person with Information About the Incident | Sex | Telephone No. | |
|---|---|---|---|
| Susan Marek | ☐ Male ☒ Female | 262-352-8659 | |
| Address | City | State | Zip Code |
| 4430 Patricia Lane | Waukesha | WI | 53186 |

Is this person an ENTITY EMPLOYEE?    ☐ Yes    ☒ No

Position in the Entity or Relationship to the Affected Person:    Was employed as Director of Wellness at time of incident

| Name - Person with Information About the Incident | Sex | Telephone No. | |
|---|---|---|---|
| James Grandberry | ☒ Male ☐ Female | 414-215-3450 | |
| Address | City | State | Zip Code |
| 4606 N. 41st St. | Milwaukee | WI | 53209 |

Is this person an ENTITY EMPLOYEE?    ☒ Yes    ☒ No

Position in the Entity or Relationship to the Affected Person:    Mr. Grandberry was employeed by the entity at the time of the incident. He was one of two second shift employees termed

| Name - Person with Information About the Incident | Sex | Telephone No. | |
|---|---|---|---|
| Jill Bayer | ☐ Male ☒ Female | 414-467-4466 | |
| Address | City | State | Zip Code |
| 4419 S. 20th St. | Milwakee | Wi | 53221 |

Is this person an ENTITY EMPLOYEE?    ☐ Yes    ☒ No

Position in the Entity or Relationship to the Affected Person:    Ms. Bayer was employed by the entity at the time of the incident. She was one of two second shift employees termed

| Name - Person with Information About the Incident | Sex | Telephone No. | |
|---|---|---|---|
| Debra Barth | ☐ Male ☒ Female | 414-570-5922 | |
| Address | City | State | Zip Code |
| 5700 Mockingbird Lane | Greendale | WI | 53129 |

Is this person an ENTITY EMPLOYEE?    ☒ Yes    ☐ No

Position in the Entity or Relationship to the Affected Person:    Executive Director of Harbour House

## VII. DESCRIBE BELOW OR ATTACH COPY OF ENTITY'S INVESTIGATIVE RECORDS CONCERNING INCIDENT.

On 10/4/17, REDACTED , resident of Harbour House, 5900 Mockingbird Lane, Greendale, WI 53129, had a fall from the toilet that she was seated on in the bathroom near the main dining rom. Mrs. REDA was transported to the hospital at approximately 8:30 PM and was returned to Harbour House at approximately 1:15 AM on 10/5/17. No injuries were sustained as a result of the fall.

Mrs. REDACT DOB is REDAC . She has diagnosis of REDACTED
REDACTED
                                                           She has been a resident of
Harbour House since 05/06/16.

An investigation into the fall found that Mrs. REDAC was placed on the toilet at approximately 2:50 PM by the day shift caregiver Kim Mims. Ms Mims left at the end of her shift, at 3 PM. She stated she informed the oncoming PM caregiver Jill Bayer, who was in the dining room that the resident was on the toilet in the bathroom next to the dining room. According to Kim Mims, the PM caregiver gave her a nod which she took as acknowledgement. During the investigation, the PM caregiver stated she was not told the resident was on the toilet. The PM caregiver wondered where the resident was during the course of the shift but thought the family must have taken her out. At approximately 7:55 PM, the PM caregiver called the family and learned that the resident was not with them. An immediate search of the neighborhood was conducted and the resident was found lying on the bathroom floor.

911 was called to the facility for transport. Greendale Police officer Dibbs also responded to the scene. He initially thought there was an unruley patient, however realized that was not the case. After arriving her thought he may have been called because of the caregiver who was very emotional or to determine if there was criminal intent. He did not belive there was any criminal intent.

Ms. Mims was given a Final Written Counseling on 10/11/17 for leaving a resident on a toilet and leaving her shift without finishing cares. Ms. Mims documented on the correction notice, "After I put resident on the toilet I had a conversation with my second shift co-worker notifying her that the resident had been toileted that she would need to get her off."

## VIII. PERSON PREPARING THIS REPORT (TYPE or PRINT neatly in BLACK INK.)

| Name – Person Preparing This Report | Telephone No. | Email Address | | |
|---|---|---|---|---|
| Debra Barth | 414-750-5922 | Debrab@seniorlifestyle.com | | |
| Street Address | | City | State | Zip Code |
| 5700 Mockingbird Lane | | Greendale | WI | 53129 |

Is this person an ENTITY EMPLOYEE?  ☒ Yes  ☐ No

Position in the Entity or Relationship to the Affected Person:   Executive Director

| SIGNATURE – Person Preparing This Report | Date Signed (MM/dd/yyyy) |
|---|---|
| ➤ *[signature]* | 2/10/18 |

**Community Name:** Garden - HH

## I. INCIDENT / OCCURRENCE

**Individual Involved**
**Name:** REDACTED

**DOB:** REDACTED   Sex:   O M   ● F

**Age:** REDACTED

**APT#:**

**Incident Date:** 10-4-2017

**Incident Time:** O AM   ● PM

I came downstairs @ 08:12

**Reported By:** Erica R. Alonso

**Witnesses:** Tasha Ramos

### III. NATURE OF INCIDENT / OCCURRENCE

O AL   ● Memo

Use this box ONLY if incident was due to FALL - was fall:
O Witnessed   OR   ● Un-witnessed
If resident hits head, call 911. If resident refuses 911, have them sign Refusal of Treatment/Transport form. If fall is un-witnessed or resident has hit head, begin Head Injury Monitoring.

O Bathroom, NOT in shower
O Bathroom, in shower
O Resident Apt. NOT at bedside
O Other:

O Resident Apt. at bedside
O Outside: parking lot, walk
O Common Area:

**MEDICATION ERROR:**   Med name / mg.
O Wrong Drug
O Wrong Dosage
O Wrong Route

O Wrong Resident
O Wrong Time
O Missed Dose

O Pharmacy Error
O Discontinued Drug

**Elopement:**
O On Premises
O Without Injury

Door Alarm Activated? O NA   O Yes   O
O Off Premises
O With Injury

**Transfer / Transport of Resident:**
O Injury Transferring Resident   O Injury Transporting Reside

**OTHER**
O Resident to resident contact:
O Unexplained bruising / injury   O Witnessed   O Un-witness
O Other:   O Theft of money or property

## II. INJURY / COMPLAINTS

### TYPE OF INJURY / COMPLAINT

● None Apparent
O Bruise
O Cut
O Bleeding

O Pain
O Skin Tear
O Swelling
O Burn

O Numbness
O Non-responsive
O Choked
O Other

### BODY PART AFFECTED

O Scalp / Skull
O Nose
O R Eye
O L Eye
O R Ear
O L Ear
O Jaw
O Mouth
O Teeth
O Other / Head
O Neck
O Spine
O Chest
O Abdomen
O Genitalia
● Back (when found)
O Other

O Pelvis
O Other / Trunk
O R Shoulder
O L Shoulder
O R Upper Arm
O L Upper Arm
O R Elbow
O L Elbow
O R Forearm
O L Forearm
O R Wrist
O L Wrist
O R Hand
O L Hand
O R Finger
O L Finger

O R Hip
O L Hip
O R Buttock
O L Buttock
O R Thigh
O L Thigh
O R Knee
O L Knee
O R Lower Leg
O L Lower Leg
O R Ankle
O L Ankle
O R Foot
O L Foot
O R Toe
O L Toe

**Time Vitals Taken:** ⊗ O AM O PM   **B/P** ⊗   **Temp.** ⊗   **Pulse** ⊗   **Resp.** ⊗

### IV. TREATMENT REQUIRED

**Transferred for treatment?**
O EMS/911   O Family   O Staff   Where:   O Yes   O

### V. NOTIFICATION / ORDERS

**Name of Nurse Notified:**
**Date:**

**Nurse's Instructions:** Fill out Incident Report, S
**Time:** O AM O P

**Name of Director Notified:**
**Date:**
**Time:** O AM O PI

**Family Member / Authorized Rep.:**
**Date:**
**Time:** O AM O PI

**Name of Physician Notified:**
**Date:**
**Time:** O AM O PM

**Physician Instructions:**

### VI. FACTS OBSERVED AT SCENE

SEE TYPED PAPER →

### VII. REVIEW / DISPOSITION

**Resident Disposition:**
O Remained in Residence
O Resident Re-assessed
O Service Plan Updated
O Staff In-Serviced
O 72 Hour Documentation started

O Hospitalized   O Returned to Residence
O Resident Refusal to Transport signed
O Outside Consultation
O Resident Counseling
O Staff Disciplinary Action

O Death   O Moved out   O Other
O Risk Agreement signed
O 24 Hour Log updated
O Head Injury Monitoring
O Management Review

O Procedure Review
O Elopement Risk Review
O Falls Risk Review
O Referred to Therapy
O Other

**Step Taken to Prevent Recurrence:**

**Name and title of person completing report:** Erica R. Alonso, caregiver
**AL/LC/Dept Director reviewed / signature:** BP Galli Alonso, caregiver ED.

**Executive Director reviewed / signature:**

**Comments / Resolution / Outcome / Final Disposition:**

**Date:** 10-8
**Date:** 10-9-17
**Date:**

### VIII. ADMINISTRATIVE AND REQUIRED NOTIFICATIONS

State agency notified as appropriate by ED, ALD, LCD or other individual

| | | | | | |
|---|---|---|---|---|---|
| RDO | | | | | |
| DQS | Phone / Fax / Email | Other: | Initials: | | Date: |
| VPO | Phone / Fax / Email | Other: | Initials: | Time: | Date: |
| Significant Event Line Called & Faxed Report | Phone / Fax / Email | Other: | Initials: | Time: | Date: |
| | Phone / Fax / Email | Other: | Initials: | Time: | Date: |
| | | | Initials: | Time: | Date: |

Incident / Occurrence Re Case 2:19-cv-00689-LA   Filed 02/01/21   Page 69 of 76   Document 24-1
Use only as authorized by Senior Lifestyle Corporation
CONFIDENTIAL

Name and title of persons who assisted **Erica R. Alonso** Date **10-8-2017**

What did the resident state was their intent or reason for the fall?

**n/a**

Was the resident (please circle one)

Lowered to the ground        (Discovered when already on the ground)

Location of resident when discovered (please circle all that apply)

Their own room        Next to bed        By their wheelchair        In the bathroom        In the hallway

In a room other than their own room (please describe in detail)

**Bathroom off Kitchen in garden**

Position resident was in when discovered (circle all that apply)

(Lying on back)   Lying face down   Lying on side   Right / Left   Sitting on buttocks   Resting on knees

Other (please describe in detail)_____

Activity by resident prior to fall (please circle one)

Lying in bed        Sitting by bed side        Sitting in W/C        Sitting on commode/toilet        Transferring

Ambulating: Where was the resident going?

Other (please describe in detail)_____

If sitting in a W/C, did resident have (please circle all that apply)

Anti-lock brakes                    Tip bars on W/C                 Were the brakes locked YES / NO

A W/C cushion?                                          YES          NO

Was a gait belt used at the time of fall?               YES          NO

Was the personal alarm (pendant) on resident or in place?   YES          NO

Does the resident wear glasses?                        YES          (NO)

Were their glasses on?                                 YES          (NO)

What type of footwear was on resident at the time of fall (circle one)

Grippy socks / Regular socks        Slippers (Shoes)        No footwear        **I don't know!**

Any recent medication changes?                         YES          NO   **?**

Was the resident reaching for a personal item when they fell?   YES          NO

Was the resident's device to call for help within reach?   YES          NO

If yes, please describe the item_____

NAME and TITLE of person completing this form: **Erica R. Alonso** Date **10-8-17**



I came downstairs thru the front stairs because the elevator was not working properly. I came in thru the door and Tynisia was sitting on the couch. A resident had just left and she went to her room in the Cottage. As I was walking thru Jill came running out stating" I can't find REDA she hasn't been here the whole shift, I've looked in all the rooms I can't find her and I called her daughter to see if she was with them." Jill was panicking and very concerned. I asked Tynisia can you please go with me to check outside on the patio in the Garden. The door was open to the patio. Tynisia and I walked outside, we found nobody. I proceeded to go by Cottage and found Tasha and I looked outside on the patio on the Cottage. We checked all the rooms, bathrooms and didn't find nobody on the Cottage side. Tasha and I came back to the Cottage. The door to the bathroom off the kitchen was closed. The fan was on you could hear it. We (Tasha and I) asked Jill if she checked the bathroom, she had said no. "We never use that bathroom, only in emergencies. (Jill said) Tasha had the keys and opened the door. REDA was found lying on the floor. She was fidgeting with her depend. There was James on the phone with Sue and Tasha was on the phone was Denys. I (Erica) told Tasha to hang up with Denys so 911 could be called. That was more important at this time. The first people to respond was Loretta's daughter and husband I believe. They were mixed with emotions seeing REDAC on the floor of the bathroom. Jill was talking and telling the family that 1st shift put her on the toilet and never took her off. Again Jill was in panic mode. James was still on the phone was Sue. (I didn't hear any conversation). The next to arrive was Ems unit. There were several people including a police officer. The police officer was documenting the incident. The police officer told Jill " to stop talking". I proceeded to go back upstairs to my household.







| | |
|---|---|
| **From:** | AT&T <suzymarek@ameritech.net> |
| **Sent:** | Wednesday, October 04, 2017 10:50 PM |
| **To:** | Debra Barth |
| **Subject:** | Investigation |

James called me and told me that they had a resident missing and they thought she was out with her family all night but it was not written on the 24 hr report so I asked who the resident was and he told me REDA. I said when was the last time you saw her and he said they never did that she was gone when they got there so they assumed she was out with family. Denys called me on my other phone so I was on the phone with James and Denys together and they stated they found her "she's on the floor in the bathroom off of the dining room." I asked if she was ok. They said yes and Denys directed them to call 911. James called me and stated Jill was "freaking out" and I asked James to put her on the phone because I could hear her screaming. I told her I needed her to be quiet now because I heard her yelling "this is first shifts fault" and she did not listen and kept yelling so I told her she needed to shut her mouth because she was speaking out of line and that she was responsible for this resident also. James grabbed the phone and said people were there and he would have to call me right back.

Sue Marek

Sent from my iPhone

Statement by Jill Bayer
Taken by Debra Barth, Executive Director
Re: Incident with ████████ on 10/4/17

The last time I saw ████ was yesterday when I put her to bed. Usually she is sitting in the hub participating in activities. She was not there when I came in. My routine is to come in, go through every room to see where everyone is. I have everyone accounted for every single day. I said, "Where's ████?" I did not get report from 1ˢᵗ shift. I asked Janelle for an update. She said BF is still on ½ hour checks and resident D** might be coming back Thursday. She told me in the hallway outside the med room. I went about my business, checked in on everybody. I got ready for med pass. I asked where ████ was. I was nagging everyone about where ████ was. The consensus was that she was out, with Tasha and James. I called her family and asked them what time they were bringing her back. I talked to Ann. She called her sister. She called me back and said she wasn't with her sister. So we started searching every room. Tasha, Erica, James, Tsanta. I think Erica found her in the bathroom. The family was on the way over. She was laying on the floor. Her pants were half on, half off. There was a big BM in the toilet. There was no blood. She said she had to go to the bathroom. Her wheel chair was in the locked position, so someone put her in the bathroom. She didn't eat supper. I don't know why I didn't call.

*[signature]*
10/4/17

Statement by James Grandberry
Taken by Debra Barth, Executive Director
Re: Incident with REDACTED on 10/4/17

I am responsible for most of the men. We have 4 men. I take the men and resident R**. Jill helped me with residents R** and C**. At 2:45 PM I started talking with Sue (Director of Wellness), talking about the job and people working. At 3 PM I came to the Unit. Girls were in the office (med room). I talked to them and they were getting ready to leave. Jill was doing (med) count and I went into activities. Played games, talking, singing, being happy. Then it was time for dinner. I pushed people in, set up tables. I was like, where's REDA. Jill said, 'She must be out.' She said, "I don't know why she's out and they (day shift) didn't give her meds." Usually family doesn't take her out, they usually visit. I didn't think anything about it. I got through cleaning the kitchen, took people to activities, took Millie to the other building, took garbage out. Jail says it seems kind of strange that REDAC out and no one's called. I had no idea that she was in the bathroom. I find it strange that she was in there. I didn't look at the 24 hour report, usually the med passer does. I'm in activity. Jill first started asking about Loretta around 4:45 -5 PM. We didn't make calls to supervisors. I thought it was strange that REDAC wasn't here. She never misses a meal, even when she's sick she still eats slowly. When her daughter's come and take her to a doctor visit she's usually back.

Jill said, "I hope they're fixing a plate." She said, "They could have told us." I said, "It's strange she's not here." I started opening doors. Instead of looking, Jill called the family. There was lots of commotion. I asked when the last time she was toileted.

(After the EMTs arrive) Jill was talking to the police. She said so and so left her on the toilet. Sue (Director of Wellness) was on my phone. I gave the phone to Jill. (Someone) said to Jill, "You're talking too much. What you should have done first is look before you call the family." We should have laid eyes on everyone.

*Jacth*
10/4/17

Statement by Kim Mims
Taken by Debra Barth, Executive Director
Re: Incident with REDACTED on 10/4/17

REDAC was the last person to eat lunch. She was wet around 2 PM. I took her to the bathroom for about 10 minutes. I took her back to the toilet around 2:50 or 2:55 PM. I had a conversation with James regarding resident B**. I told Jill that REDA was on the toilet and she needed to get her off. Jill was talking to resident S** and his caregiver. Jill was getting up to go to the med room. Jill gave me a nod. I thought she heard me. It was quiet. James would have heard me, too.

*J Barth*
10|5|17

5:40 PM Oct. 5, 2017

Officer Dibb from the Greendale Police Dept came to HV and met with Shawn Lynch and myself.

He recalled the phone conversation that was overheard between caregiver Jill and DOW Sue Marek.

He saw James hand Jill the phone. The phone was on speaker phone. Sue said to Jill, "You need to shut your mouth. Quit talking." Jill then walked away from the area with the phone and continued talking to Sue.

The Son in law, a para medic and Officer Dibbs heard part of the conversation as the phone was on speaker. They were uncomfortable with how the interaction between Sue and Jill sounded. The officer said when someone tells another person to shut up it can be because they don't want them to give information.

He said the Paramedic commented to him when leaving the community about the comment.

Officer Dibb said that in retrospect he thought that given the dynamics of the situation and the fact that Jill was excitable and talking over the fire fighters and officer, Sue may have been attempting to quiet her.

Officer Dibb said he was called by the firefighter because someone was being unruly. He initially thought it was a patient, but when he got to the scene he realized it wasn't. He thought the call may have been because of the caregiver. He said he also may have been called to determine if there was criminal intent.

We discussed my investigation so far and he does not believe there was criminal intent.

J Dalton GD
10/5/17